UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                         :

UNITED STATES OF AMERICA

                                         :

          - v. -                            S3 12 Cr. 887 (ALC)

                                         :

BENJAMIN DURANT, and
DARYL PAYTON,                          :

              Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>

 

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
    of America.

Jessica Masella
Andrew Bauer
Damian Williams
Assistant United States Attorneys
    – Of Counsel –

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..…… . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  The Indictment….……. . …. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..… . 1

    B.  Discovery and Other Materials Provided. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT

    I.    THE INDICTMENT'S ALLEGATIONS OF INSIDER TRADING ARE
        SUFFICIENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.    The Indictment's Allegations Are More Than Sufficient Under
             Rule 7(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

        B.    The Indictment Properly Alleges That Martin Owed a Fiduciary Duty to
             Attorney-1, and That the Defendants Had Knowledge That the Inside
             Information Was Obtained in Breach of a Duty…… . . . . . . . . . . . ..... . 10

        C.    The Government Is Not Required to Prove that the Defendants Knew that
             Martin Received a Personal Benefit……………………………………..16

    II.    THE INDICTMENT PROPERLY ALLEGES INSIDER TRADING BASED ON
        A MISAPPROPRIATION THEORY OF FRAUD. . . . . . ..………………. . 18

    III.    RULE 10b5-2(B)(2) FALLS WELL WITHIN THE SEC's BROAD
        RULEMAKING AUTHORITY. . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        A.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        B.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
             1.    Section 10(b) Does Not Address Which Relationships
                     Give Rise to a Duty of Trust or Confidence……..……..………..25
             2.    *United States* v. *Chestman* Does Not Foreclose
                     Rule 10b5-2(b)(2)……………………………………..………..26
             3.    Rule 10b5-2(b)(2) is a Reasonable Interpretation
                     of Section 10(b)………………………….……………………..30

    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## TABLE OF AUTHORITIES

**Cases**                                                          **Pages**

*Chevron U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ............................................................... 23, 24, 30

*Chiarella* v. *United States*,
445 U.S. 222 (1980) ............................................................... 11, 25, 28

*Costello v. United States*,
350 U.S. 359 (1956) ...................................................................... 8

*Dirks* v. *SEC*,
463 U.S. 646 (1983) ...................................................................... 21

*Hamling* v. *United States*,
418 U.S. 87 (1974) ........................................................................ 8

*National Cable & Telecomm. Ass'n* v. *Brand X Internet Serv.*,
545 U.S. 967 (2005) .............................................................. *passim*

*Roth ex rel. Beacon Power Corp.* v. *Perseus L.L.C.*,
522 F.3d 242 (2d Cir. 2008) ......................................................... 24

*SEC* v. *Conradt*,
12 Civ. 8676 (JSR) (S.D.N.Y. June 4, 2013) ........................... 10, 12, 14

*SEC* v. *Obus*,
693 F.3d 276 (2d Cir. 2012) .................................................... *passim*

*SEC* v. *Yun*,
327 F.3d 1263 (11th Cir. 2003) .................................................... 22

*SEC* v. *Zandford*,
535 U.S. 813 (2002) .................................................................... 25

*Swallows Holding Ltd.* v. *Comm'r*,
515 F.3d 162 (3d Cir. 2008) ....................................................... 32

*United States* v. *Al Kassar*,
582 F. Supp. 2d 488 (S.D.N.Y. 2008) .......................................... 8, 9

*United States* v. *Bout*,
731 F.3d 233 (2d Cir. 2013) .......................................................... 9

*United States* v. *Chestman*,
947 F.2d 551(2d Cir. 1991) .................................................... *passim*

*United States* v. *Corbin*,
729 F.Supp.2d 607 (S.D.N.Y. 2010) ............................................ 31

*United States* v. *Falcone*,
257 F. 3d 226 (2d Cir. 2001) ........................................................ 11

*United States* v. *Ferrarini*,
9 F. Supp. 2d 284 (S.D.N.Y. 1998) ................................................ 9

*United States* v. *Grossman*,
843 F.2d 78 (2d Cir. 1988) ............................................................ 9

*United States* v. *Jiau*,
743 F.3d 147, 153 (2d Cir. 2013)…………………………………………………..…………….…..18
*United States* v. *LaSpina*,
299 F.3d 165 (2d Cir. 2002) ........................................................... 8
*United States* v. *Libera*,
989 F.2d 596 (2d Cir. 1993) .......................................................... 11
*United States* v. *McGee*,
763 F.3d 304 (3d Cir. 2014) ................................................... *passim*
*United States* v. *Mylett*,
97 F.3d 663 (2d Cir. 1996) ........................................................... 11
*United States* v. *Newman*,
Case No. 13-1917 ...................................................................... 17
*United States* v. *O'Hagan*,
521 U.S. 642 (1997) ...................................................... 11, 19, 21, 30
*United States* v. *Rajaratnam*,
2014 WL 1554078 (S.D.N.Y. Apr. 17, 2014) ....................................... 17
*United States* v. *Reed*,
601 F.Supp. 685 ....................................................................... 29
*United States* v. *Rittweger*,
259 F. Supp. 2d 275 (S.D.N.Y. 2003) ............................................... 9
*United States* v. *Royer*,
549 F.3d 886 (2d Cir. 2008) ......................................................... 23
*United States* v. *Silverman*,
430 F.2d 106 (2d Cir. 1970) .......................................................... 8
*United States* v. *Sperling*,
506 F.2d 1323 (2d Cir. 1974) ......................................................... 8
*United States* v. *Stavroulakis*,
952 F.2d 686 (2d Cir. 1992) .......................................................... 8
*United States* v. *Steinberg*,
No. 12 Cr. 121 (RJS) .................................................................. 17
*United States* v. *Walsh*,
194 F.3d 37 (2d Cir. 1999) ............................................................ 8
*United States* v. *Whitman*,
904 F. Supp. 2d 363 (S.D.N.Y. 2012) ......................................... *passim*

## Statutes

15 U.S.C. § 78w(a) ..................................................................... 20
Title 15, United States Code, Sections 78j(b) & 78ff ...................... 2, 7, 20
Title 18, United States Code, Section 2 ............................................ 2
Title 18, United States Code, Section 371 ...................................... 2, 7

**Federal Rules**

Fed. R. Crim. P. 7(c) ...................................................................................................... 8

**Regulations**

17 C.F.R. § 240.10b-5.............................................................................................. *passim*
17 C.F.R. § 240.10b5-2............................................................................................ *passim*
45 Fed. Reg. 60412 (1980) ............................................................................................ 30
64 Fed. Reg. 72, 590 (1999) .......................................................................................... 22

**Other Authorities**

Barbara Bader Aldave, <u>Misappropriation: A General Theory of Liability for Trading on
Nonpublic Information</u>, 13 Hofstra L. Rev. 101 (1984) ......................................... 22

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the October 20, 2014 motions by defendants Benjamin Durant and Daryl Payton (collectively, the "defendants") to dismiss the Indictment in this matter and for certain other relief (the "Durant Mem." and "Payton Mem.," respectively).  Durant moves, and Payton joins, to dismiss the Indictment on the purported basis that it is deficient because it does not allege that Durant knew that the tipping conspirator, Trent Martin, had (i) breached a duty of confidentiality to his friend, Attorney-1, and (ii) received a personal benefit in return for his disclosure of material nonpublic information.  In addition, Payton moves, and Durant joins, to dismiss the Indictment based on his argument that any deception underlying the misappropriation theory of the fraud in this case was cured because Martin had disclosed to Attorney-1 that he, Martin, had traded based on the material nonpublic information that Attorney-1 had shared with him.  Also, Durant moves, and Payton joins, to dismiss the Indictment based on his argument that Rule 10b5-2(b)(2), under which a duty of trust or confidence may arise from a history, pattern, or practice of sharing confidences and on which the theory of the breach of a duty in this case is based, exceeds the SEC's rulemaking authority.  For the reasons that follow, the defendants' motions should be denied in their entirety.

## STATEMENT OF FACTS

### A.  The Indictment

Indictment S3 12 Cr. 887 (ALC) (the "Indictment") was returned on October 29, 2014 in six counts.[1]  Count One charges both defendants with conspiracy to commit securities fraud

---

[1]       The defendants' motions are addressed to the charges in Indictment S2 12 Cr. 887 (ALC), which was returned by the grand jury on June 24, 2014 (the "S2 Indictment").  As described below, the Government superseded the S2 Indictment on October 29, 2014 with Indictment S3 12 Cr. 887 (ALC) (which will be referenced herein as the "Indictment" or the "S3 Indictment" and is the operative indictment for trial).

based on their participation in an insider trading scheme from in or about June 2009 through in or about July 2009, in violation of Title 18, United States Code, Section 371.  Counts Two and Three charge Durant, and Counts Four through Six charge Payton, with substantive securities fraud violations based on insider trading conduct, pursuant to Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2(b)(1) & (2), and Title 18, United States Code, Section 2.  The charges in the Indictment stem from an insider trading scheme in which Benjamin Durant, Daryl Payton, and others obtained material nonpublic information relating to a potential corporate acquisition for the purpose of executing profitable securities transactions ahead of the public announcement of that acquisition.

More specifically, the Indictment alleges that Durant and Payton were stock brokers in the Manhattan office of a Connecticut-based securities trading firm ("Securities Trading Firm-1") during June and July of 2009.  (Ind. ¶¶ 1-9).  Thomas Conradt, David Weishaus and another co-conspirator not charged as a defendant ("CC-1") were also stock brokers at the Securities Trading Firm-1 during the same time period.  Trent Martin, an Australian-born research analyst for a financial services firm, was Conradt's roommate and friend in June and July 2009.  (*Id*.).  Finally, during this same time period, Attorney-1, a citizen of New Zealand, was an associate at a large New York-based law firm (the "New York Law Firm").  (*Id*.).

Martin and Attorney-1 were close friends who had a history, pattern and practice of sharing confidences with each other relating to their careers, families, relationships, and plans for the future.  (Ind. ¶ 13).  In addition, they sought advice from each other and shared common interests, a common cultural background, and the common experience of being single men who worked in demanding industries and lived far from their home countries.  (*Id*.).  During 2008 and

2009, Attorney-1 and Martin exchanged personal confidences as well as nonpublic information concerning their jobs.  (Ind. ¶ 14).

As set forth in the Indictment, beginning in the spring of 2009, the New York Law Firm represented International Business Machines ("IBM") in connection with an offer by IBM to acquire SPSS, Inc. ("SPSS"), a smaller publicly-traded software company (the "IBM/SPSS Transaction").  (Ind. ¶ 15).  On May 26, 2009, Attorney-1 was assigned to work on the IBM/SPSS Transaction, which was confidential at that time, and, as such, Attorney-1 was privy to material nonpublic inside information related to the IBM/SPSS Transaction (the "Inside Information").  (Ind. ¶ 16).  During the course of his work on the IBM/SPSS Transaction, Attorney-1 learned, among other things, the names of the parties involved, the nature of the transaction, and the share price at which IBM proposed to purchase SPSS.  (*Id.*).

On May 31, 2009, several days after beginning work on the IBM/SPSS Transaction, Attorney-1 met his close friend Martin for brunch.  (Ind. ¶ 17).  During that meeting, Attorney-1 confided in Martin regarding the stress that he was experiencing in his job at the New York Law Firm, and shared certain details of the IBM/SPSS Transaction with Martin, including the fact that IBM had offered to buy SPSS and that the offering price would be at a significant premium to the current market price for SPSS.  (Ind. ¶¶ 17-18).  At that time, this information was not publicly known, and Attorney-1 expected that Martin would keep the information confidential based on their history, pattern and practice of sharing confidences and Martin's training and experience as a research analyst.  (Ind. ¶¶ 18-19).

After learning about the IBM/SPSS Transaction from Attorney-1, Martin purchased SPSS common stock and SPSS call option contracts.  (Ind. ¶ 20).[2]  Subsequently, Martin told

---

[2]     A call option contract gives the holder an option to purchase common stock at a price specified in the contract, at any time up to the expiration date of the option.  In this case, the defendants and their co-conspirators

Conradt about the IBM/SPSS Transaction, and Conradt passed the information to Weishaus, CC-1, and defendants Durant and Payton.  (Ind. ¶ 22).  Thereafter, Durant and Payton, as well as Weishaus and CC-1, purchased SPSS call option contracts with expiration dates in August and September 2009.  (Ind. ¶¶ 23-24, 27).   Conradt purchased SPSS common stock, and Martin purchased SPSS call options and SPSS common stock.  (Ind. ¶¶ 25, 26, 28).

In late July and before the public announcement of the IBM/SPSS Transaction, Martin told Attorney-1 that Martin had purchased stock and call option contracts in SPSS on the basis of the Inside Information provided to Martin by Attorney-1.  (Ind. ¶ 29).  Attorney-1 was furious with Martin, and he told Martin that he should sell his SPSS call options and stock immediately.  (*Id.*).  On July 24, 2009, Martin sold all of his SPSS call option contracts and the majority of his SPSS stock.  (Ind. ¶ 30).  Martin did not tell Attorney-1 that he had disclosed the Inside Information about the IBM/SPSS Transaction to others, including Conradt, at that time.  Instead, Martin told Attorney-1 in November 2010 – over a year later – that he had passed the Inside Information to Conradt.  (Ind. ¶ 47).

On July 28, 2009, IBM and SPSS publicly announced the IBM/SPSS Transaction.  (Ind. ¶ 31).  The same day as the public announcement, SPSS's share price increased more than 40% over the prior day's closing price.  (*Id.*).  Several hours after the announcement, Durant, Conradt, and CC-1 went to lunch together at a restaurant near their office.  (Ind. ¶ 32).  During that lunch, CC-1 discussed, among other things, the fact that he had sought legal advice in connection with his trading in SPSS.  (*Id.*).  Durant paid for everyone's lunch, but stated that he would pay in cash, so as not to generate a record of their lunch meeting.  (*Id.*).  Later that night, Durant and Payton met with Conradt, Weishaus, and CC-1 at a hotel in Manhattan.  (Ind. ¶ 33).  During that

---

purchased call options at prices higher than the current stock price of SPSS, with expiration dates after the anticipated acquisition by IBM, which have value only if the price of SPSS stock increased before the expiration date of the call option contracts.

meeting, the defendants and the others discussed their trading in SPSS securities, how much money they had made trading in advance of the announcement of the IBM/SPSS Transaction, and the fact that, if anyone asked about their trading, they should simply say that they liked technology stocks.  (*Id*.).

A few days after the announcement of the IBM/SPSS Transaction and before selling his SPSS call options, Payton transferred his SPSS call options from his account at Securities Trading Firm-1 to two different accounts that he had just opened at Interactive Brokers.  (Ind. ¶ 36).  In the course of opening his account at Interactive Brokers, via a telephone call that was recorded, Payton lied about his employment, stating that he was a "self-employed real estate consultant" rather than a stock broker at Securities Trading Firm-1.  (*Id*.).  During the same call, a representative from Interactive Brokers told Payton that if he worked at a broker/dealer, duplicate account statements might have to be sent to his employer.  (*Id*.).

In November 2009, Securities Trading Firm-1 conducted an internal investigation into the trading of SPSS securities by Durant and Payton and others.  (Ind. ¶ 41).  In connection with that investigation, Durant and Payton completed written questionnaires related to their trading in SPSS securities.  (*Id*.).  In completing his questionnaire, Durant stated that he purchased SPSS securities based on his own research from various publicly available sources, and he did not mention that he had heard about the IBM/SPSS Transaction from Conradt or anyone else.  (Ind. ¶ 42).  In completing his questionnaire, Payton stated that he had heard about SPSS from Durant, who told him that the company was a technology company with possible "near term upside," and Payton did not mention that he had heard about the IBM/SPSS Transaction from Conradt or anyone else.  (Ind. ¶ 43).

**B.  Discovery and Other Materials Provided**

Pursuant to Rule 16 of the Federal Rules of Criminal Procedure, the Government provided extensive discovery to the defendants in connection with the charges in the Indictment. During July and August 2014, the Government provided, among other things: (i) records related to the defendants' securities trading activity during the relevant time period; (ii) the defendants' and other co-conspirators' electronic communications captured by Securities Trading Firm-1; (iii) the defendants' bank records and brokerage account records; (iv) other documents provided by Securities Trading Firm-1 related to its internal investigation of the defendants' and their co-conspirators' trading in SPSS securities; (v) recordings of several phone calls and documents related to defendant Payton's opening of brokerage accounts at Interactive Brokers; and (vi) other documents provided by Securities Trading Firm-1, the New York Law Firm, and IBM.

The Government has also provided detailed reports containing the statements of several important witnesses.  In particular, on October 17, 2014, the Government provided approximately fifteen reports written by the investigating case agent in this case.  Those reports detail the content of the Government's interviews of (i) three individuals (Thomas Conradt, Trent Martin, and David Weishaus), each of whom pleaded guilty in this case pursuant to a cooperation agreement with the Government and whom the Government expects will testify at the trial in this matter; and (ii) the individual who is referenced as "Attorney-1" in the Indictment.

## ARGUMENT

## I.  THE INDICTMENT'S ALLEGATIONS OF INSIDER TRADING ARE SUFFICIENT

The defendants first move to dismiss the Indictment on the purported basis that it fails to allege each of the essential elements of securities fraud (based on insider trading), and conspiracy to commit the same, pursuant to Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 371.  Specifically, the defendants argue that the S2 Indictment failed to allege (i) that the defendants "knew the information [they] received from Conradt was tainted by Martin's breach of a fiduciary duty to Attorney-1" and (ii) that Martin in fact owed such a duty to Attorney-1. (Durant Mem. 4).  That argument is meritless.  Instead, the charges in the S2 Indictment were sufficiently pled to include the essential elements of the crimes charged.

Nevertheless, the Government superseded the S2 Indictment on October 29, 2014 to insert some of the explicit language that the defendants claimed was previously lacking.  The additions to the S3 Indictment have mooted much of the basis for the defendants' arguments in their motions to dismiss.[3]  For these reasons, and those stated below, the Government respectfully submits that the defendants' motions should be denied in their entirety.

### A.  The Indictment's Allegations Are More Than Sufficient Under Rule 7(c)

Rule 7(c) of the Federal Rules of Criminal Procedure requires only that an indictment contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).  To be legally sufficient, "an indictment need do little

---

[3]      In all other respects, the superseding S3 Indictment is nearly identical to the S2 Indictment.  Most notably, the charges in the two indictments are the same.  The only material differences between the indictments are a three-paragraph summary section titled "Overview of the Insider Trading Scheme" (Ind. ¶¶ 10-12), the inclusion of additional details regarding Martin's duty of trust and confidence to Attorney-1 (Ind. ¶ 13) and the defendants' knowledge of Martin's breach  (Ind. ¶¶ 32, 51(c)-(e)).

more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States* v. *Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (citations omitted); *see also United States* v. *Al Kassar*, 582 F. Supp. 2d 488, 496 (S.D.N.Y. 2008), *aff'd* 660 F.3d 108 (2d Cir. 2011); *United States* v. *Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) (citations omitted).  "In short, 'an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States* v. *LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (quoting *Hamling* v. *United States*, 418 U.S. 87, 117 (1974)).  An indictment also "must be read to include facts which are necessarily implied by the specific allegations made." *Stavroulakis*, 952 F.2d at 693 (quoting *United States* v. *Silverman*, 430 F.2d 106, 111 (2d Cir. 1970)).  Thus, a facially-valid indictment "is enough to call for trial of the charge on the merits." *Costello* v. *United States*, 350 U.S. 359, 363 (1956).  Finally, while the production of substantial Rule 16 "discovery cannot save a defective indictment, . . . where the indictment has been found even minimally sufficient, a court may look to the record as a whole in determining whether the defendant is protected from double jeopardy in a subsequent prosecution and whether the defendant has had an adequate opportunity to prepare his defense." *Walsh*, 194 F.3d at 45 (citing *Stavroulakis*, 952 F.2d at 693; *United States* v. *Sperling*, 506 F.2d 1323, 1344 (2d Cir. 1974)) (internal quotation marks omitted).

The case law in the securities fraud context (as in others) makes clear that the Government need not identify in an indictment the specific facts to support the elements of its charges and need do little more than track the statutory language.  *See, e.g.*, *United States* v. *Grossman*, 843 F.2d 78, 84 (2d Cir. 1988) (securities fraud indictment "need do little more than

to track the language of the statute charged and state the time and place . . . of the alleged crime"); *United States* v. *Rittweger*, 259 F. Supp. 2d 275, 287-88 (S.D.N.Y. 2003) (Koeltl, J.) (denying motion to dismiss indictment charging securities fraud, wire fraud and violations of the Travel Act, stating that the charges "satisfy the well-established pleading requirements in this Circuit – they are pleaded in the language of the statutes and provide sufficient particulars to provide notice to the defendants and to permit the defendants to plead double jeopardy"); *United States* v. *Ferrarini*, 9 F. Supp. 2d 284, 296 (S.D.N.Y. 1998) (Cote, J.) (denying motion to dismiss securities fraud indictment because the allegations "conspicuously track[ed] the language of [the statute] and g[a]ve[] notice of the time and place of the alleged crime").

Here, the Indictment's allegations more than satisfy the relevant pleading standard. Not only does the Indictment track the language of the relevant statutes, (Ind. ¶¶ 49-56), but it also provides a copious amount of additional factual detail, fairly informing the defendants of the charges against which they must defend. (*Id.* ¶¶ 1-48). Under Rule 7(c), nothing more is required. *See, e.g.*, *United States* v. *Bout*, 731 F.3d 233, 240-41 (2d Cir. 2013) ("Indeed, 'in an indictment for conspiring to commit an offense – in which the conspiracy is the gist of the crime – it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy.") (internal citation omitted); *Al Kassar*, 582 F. Supp. 2d at 496. As discussed below, insofar as the S3 Indictment tracks the statutory language and/or pleads the factual details for each element of the crimes charged, it is therefore facially valid, and sufficient to warrant a trial on the merits.

**B.      The Indictment Properly Alleges That Martin Owed a Fiduciary Duty to Attorney-1, and That the Defendants Had Knowledge That the Inside Information Was Obtained in Breach of a Duty**

The defendants argue that in the S2 Indictment the Government has failed to allege the "essential elements" of (i) the existence of the duty and (ii) the defendants' knowledge of Martin's breach of that duty.  However, the S3 Indictment clearly alleges that Martin breached a duty of trust and confidence when he provided the Inside Information to Conradt and that the defendants' knew the Inside Information was disclosed without authorization.  As such, much of the defendants' argument has been mooted by the detailed language in the S3 Indictment.

Furthermore, the Second Circuit has never required the Government to prove that the defendants knew of Martin's breach in particular (as opposed to a breach in general), let alone Martin's potential benefit stemming from that breach.  As discussed below, whether the defendants "knew of Attorney-1's existence, much less the relationship" between Martin and Attorney-1, or that the defendants "knew Martin benefited from tipping Conradt," (Durant Mem. 11, 15), are not essential elements of this crime.  Instead, the Government must allege, and has done so here, that "a tippee [had] some level of knowledge that by trading on the information the tippee is a participant in the tipper's breach of fiduciary duty."  *See SEC* v. *Conradt, et al.*, 12 Civ. 8676 (JSR) (S.D.N.Y. June 4, 2013), at 13 (quoting *SEC* v. *Obus*, 693 F.3d 276, 287 (2d Cir. 2012)).[4]  In this case, the Indictment provides ample detail alleging that the defendants knew that Inside Information provided by Conradt was based on an unauthorized disclosure – a breach of a duty – even if the defendants were not aware of the specific breach.  Accordingly, the defendants' motion to dismiss the indictment should be denied.

There are two prevailing theories of insider trading liability.  Under the "classical theory" of insider trading, "a corporate insider is prohibited from trading shares of that corporation based

---

[4]      A copy of this opinion is attached hereto as Exhibit A.

on material non-public information in violation of the duty of trust and confidence insiders owe

to shareholders." *Obus*, 693 F.3d at 284 (citing *Chiarella* v. *United States*, 445 U.S. 222, 228

(1980)).  The "misappropriation theory," which is applicable here, "targets persons who are not

corporate insiders but to whom material non-public information has been entrusted in confidence

and who breach a fiduciary duty to the source of the information to gain personal profit in the

securities market." *Obus*, 693 F.3d at 284 (citing *United States* v. *O'Hagan*, 521 U.S. 642, 652

(1997); *United States* v. *Chestman*, 947 F.2d 551, 566 (2d Cir. 1991) (en banc)).

 The Second Circuit has repeatedly recognized that tippee liability in a misappropriation

case exists where (1) there is a breach by the tipper of a duty owed to the owner of the nonpublic

information; and (2) the tippee had knowledge that the tipper had breached a duty.  *See United*

*States* v. *Libera*, 989 F.2d 596, 600 (2d Cir. 1993) ("We believe these two elements, without

more, are sufficient for tippee liability."); *see, e.g.*, *United States* v. *Falcone*, 257 F. 3d 226, 234

(2d Cir. 2001) (holding, post-*O'Hagan*, "to support a conviction of the tippee defendant, the

government was simply required to prove a breach by, [] the tipper, of a duty owed to the owner

of the misappropriated information, and the defendant's knowledge that the tipper had breached

the duty"); *United States* v. *Mylett*, 97 F.3d 663, 668 (2d Cir. 1996) (explaining that tippee

defendants must "subjectively believe that the [inside] information was obtained in breach of a

fiduciary duty").

 Judge Rakoff addressed this exact issue, albeit in the civil context, in the parallel civil

matter to this very case (the "SEC Case"), finding that a "lynchpin of misappropriation

liability… is the existence of 'a fiduciary duty or similar relationship of trust and confidence'

between the tipper and tippee."  *SEC* v. *Conradt, et al.*, 12 Civ. 8676 (JSR) at 9 (quoting

*Chestman*, 947 F.2d at 566).  Judge Rakoff went on to find that the Government is not required

to allege the specifics of a tipper's breach, and that "the SEC is not required to show 'that a remote tippee knew for certain how the initial breach of fiduciary duty occurred,'" but only that "the tipper's conduct raised red flags that confidential information was being transmitted improperly." *SEC* v. *Conradt, et al.*, 12 Civ. 8676 (JSR) at 13 (quoting, in turn, *SEC* v. *Thrasher*, 152 F. Supp. 2d 291, 304 (S.D.N.Y. 2001), and *Obus*, 693 F.3d at 288). In a criminal case, the Government would be required to prove more than that the tippee *should* have known of the tipper's breach, but Judge Rakoff's conclusion that the tippee need not know the specifics of the breach, but rather that information was transmitted improperly pursuant to a breach of a duty, applies with equal force in civil and criminal cases alike.

Thus, in *United States* v. *Whitman*, a criminal insider trading case, Judge Rakoff stated similarly that "the tippee's knowledge that disclosure of the inside information was unauthorized is sufficient for liability in a misappropriation case." 904 F. Supp. 2d 363, 370 (S.D.N.Y. 2012). In so holding, Judge Rakoff quoted *Obus* for the proposition that the proper inquiry, whether in the civil or criminal context, is whether a tippee knew (or, in the civil context, "had reason to know") that "the information was obtained through the tipper's breach." *Id*. (quoting *Obus*, 693 F.3d at 289). In short, the Government has never been required, in a misappropriation case such as this, to allege in an indictment that a tippee knew the specifics of a tipper's duty or breach. The defendants point to no cases which so hold. Instead, the Government must allege (as we have here) that the defendants knew that the Inside Information stemmed generally from an "unauthorized" breach. *Id*.

Applying that standard, the S3 Indictment is replete with references to both Martin's duty of trust and confidence to Attorney-1, and to the fact that Durant and Payton learned of the Inside

12

Information through an unauthorized disclosure by Martin.  To the first point, the Indictment

repeatedly and specifically alleges that Martin owed Attorney-1 a duty of trust and confidence:

- "Between May and July 2009, Attorney-1 disclosed to Martin the Inside Information, consistent with their pattern and practice of sharing confidences.  In violation of the duty of trust and confidence that Martin owed to Attorney-1, Martin traded on the Inside Information and tipped the Inside Information to his roommate, Conradt."  (Ind. ¶ 11).

- "Martin and Attorney-1 were close friends who had a history, pattern and practice of sharing confidences with each other relating to their careers, families, relationships, and plans for the future."  (Ind. ¶ 13).

- "Attorney-1 expected that Martin would keep it confidential because of, among other reasons, their history, pattern and practice of sharing confidences."  (Ind. ¶ 18).

- "Martin misappropriated Inside Information from Attorney-1 concerning the IBM/SPSS Transaction in violation of the duty of trust and confidence that Martin owed to Attorney-1, with whom Martin had a history, pattern and practice of sharing personal and professional confidences, such that Martin knew that he should not trade on the Inside Information or share it with others."  (Ind. ¶ 51(b)).

The Indictment also alleges a number of specific facts about Martin's relationship with

Attorney-1 that demonstrate their history, pattern and practice of sharing confidences.  For

instance, it is alleged that "Martin and Attorney-1 sought advice from each other and shared

common interests, a common cultural background, and the common experience of being single

men who worked in demanding industries and lived far from their home countries of,

respectively, Australia and New Zealand."  (Ind. ¶ 13).  In addition, "Attorney-1 and Martin

exchanged personal confidences as well as non-public information concerning their jobs."  (Ind.

¶ 14).  The Indictment lists two specific examples of their exchange of confidences:

- "[O]n one occasion when Martin and Attorney-1 were at a comedy club together in or about December 2008, Martin handed his Blackberry to Attorney-1 so that Attorney-1 could read an e-mail that Martin had sent to colleagues at his firm in which he provided advice about the stock market."  (Ind. ¶ 14).

13

- "On another occasion, in or about June 2009, Martin sought Attorney-1's advice after he was arrested in connection with an altercation in Grand Central Terminal in New York, New York."  (Ind. ¶ 14).

In rejecting a similar motion in the SEC Case, Judge Rakoff stated that "the sensitive nature of many of the personal and professional confidences shared between Martin and [Attorney-1] bespeak an implicit mutual understanding of confidentiality."  *SEC* v. *Conradt, et al.*, 12 Civ. 8676 (JSR) at 12.  Judge Rakoff went on: "The existence and strength of that understanding was starkly confirmed when, after Martin initially confessed his trading to [Attorney-1], [Attorney-1] expressed outrage and demanded that Martin immediately sell off his SPSS holdings, a demand with which Martin substantially complied."  *Id.*; *see also* Ind. ¶¶ 29-30.  As Judge Rakoff concluded, "[s]uch emotional apologies would have been unnecessary, and indeed out of place, if Martin had not understood that [Attorney-1] expected Martin not to tip or trade on the information [Attorney-1] had shared with Martin."  *Id.* at 13.  As such, Judge Rakoff held that "Martin and [Attorney-1] had a sufficient history, pattern, or practice of sharing confidences that they mutually expected and understood that the information was not to be tipped or traded upon."  *Id.*

Furthermore, as discussed above, the Second Circuit has never required the Government to allege that the defendants knew of Martin's specific breach of a duty.  Nevertheless, like the SEC's pleading in the SEC Case, the Indictment contains numerous examples of the defendants' knowledge that Martin's disclosure of the Inside Information was unauthorized.  Again, Judge Rakoff's analysis in the SEC Case is instructive.  In that case, Judge Rakoff held that a downstream tippee – Durant and Payton here, Weishaus in the SEC Case – "knew that Martin and Conradt had obtained and transmitted the information to him improperly."  *Id.* at 14.  As support for this point, Judge Rakoff noted that "Conradt told Weishaus that Conradt's

information came from Martin, but also that Martin warned Conradt 'not to tell anyone.'"  *Id.*

Similarly, the S3 Indictment repeatedly alleges that Durant and Payton knew that the Inside

Information came from Martin, who was Conradt's roommate and friend.  The S3 Indictment

also alleges that the defendants were told that Martin had instructed Conradt not to share the

information:

> Conradt, in turn, shared the Inside Information concerning the
> IBM/SPSS Transaction with BENJAMIN DURANT and DARYL
> PAYTON, the defendants, and David J. Weishaus and CC-1.  In
> particular, Conradt told DURANT, PAYTON, Weishaus, and CC-
> 1 that he had obtained the Inside Information from his roommate,
> Martin, who had instructed Conradt not to further disseminate the
> Inside Information.

(Ind. ¶¶ 11, 51(d)).  Based on this allegation alone, the Indictment sufficiently alleges that Durant

and Payton knew that "disclosure of the inside information was unauthorized."  *Whitman*, 904 F.

Supp. 2d at 370.

      The Indictment, however, does not stop there.  The Indictment further alleges that Durant

and Payton each took a series of deceitful steps that evince a clear knowledge and understanding

that Martin's disclosure of the Inside Information was the result of an unauthorized breach.  On

the day the IBM/SPSS Transaction was announced, for instance, both defendants participated in

a meeting among tippees in which they discussed a cover-up story, suggested by Durant, which

would include saying, if asked, that "they liked technology stocks."  (Ind. ¶ 33).  Durant also

took part in a second meeting earlier that day, at lunch, in which he stated that he preferred

paying in cash so as to not generate a record of their meeting.  (Ind. ¶ 32).  Payton, before selling

his call options, transferred the securities to different brokerage accounts and, in the process, lied

about the fact that he was employed by a broker/dealer, which would have required disclosure of

the trades to his employer.  (Ind. ¶ 36).  Finally, both defendants submitted false statements to

their employer when asked, in November 2009, how and from whom they had heard about SPSS. (Ind. ¶¶ 43-45).  From these allegations, this Court can and respectfully should draw the fair inference, as Judge Rakoff did in the SEC Case, that the Indictment alleges that the defendants had "some level of knowledge that . . . [they were] participant[s] in the tipper's breach of fiduciary duty."  *Obus*, 693 F.3d 287.

## C.    The Government Is Not Required to Prove that the Defendants Knew that Martin Received a Personal Benefit

Finally, as noted earlier, the Second Circuit has never required the Government to prove that a successive tippee knew the original tipper who disclosed confidential information did so for a personal benefit, and the Government is aware of no decision from any other Court of Appeals imposing such a requirement.  To the contrary, as Durant himself concedes in his motion, in *Obus*, the Second Circuit did not require the SEC to prove that the tippees knew the tipper had disclosed inside information for a personal benefit.  (Durant Mem. 15).  In *Obus*, the Second Circuit considered whether the SEC had presented sufficient evidence to avoid summary judgment for the defendants (a tipper, an immediate tippee, and a successive tippee).  In finding that it had done so, and in rejecting the defendants' argument regarding the level of knowledge required on the tippee's part as to the tipper's breach, the Second Circuit summarized the elements as follows:

> [We] hold that tipper liability requires that (1) the tipper had a duty
> to keep material non-public information confidential; (2) the tipper
> breached that duty by intentionally or recklessly relaying the
> information to a tippee who could use the information in
> connection with securities trading; and (3) the tipper received a
> personal benefit from the tip.  Tippee liability requires that (1) the
> tipper breached a duty by tipping confidential information; (2) the
> tippee knew or had reason to know that the tippee improperly
> obtained the information (*i.e.*, that the information was obtained
> through the tipper's breach); and (3) the tippee, while in knowing

> possession of the material non-public information, used the
> information by trading or by tipping for his own benefit.

*Obus*, 693 F.3d at 289.

To be sure, as the defendants point out, the Second Circuit is currently considering the question whether the Government must prove that a remote tippee knew that the insider received a benefit in exchange for the breach of a duty.  *See United States* v. *Newman*, Case No. 13-1917 (argued Apr. 22, 2014).  Courts in this District have divided on this question.  *Compare United States* v. *Steinberg*, No. 12 Cr. 121 (RJS) (Rule 29 Mem. and Order) (May 15, 2014) ("To the extent that knowledge of breach of duty is distinct from knowledge of benefit, under Second Circuit precedent there is no requirement that the government prove that a defendant knew anything other than that the tippers breached a duty."), *with Whitman*, 904 F. Supp. 2d at 371 (holding that tippee must "know whether the tipper is anticipating something in return for the unauthorized disclosure").  As we have argued in that appeal, there is no requirement, even in the classical context, for a remote tippee to know that the insider received a benefit.  But in any event, even in *Whitman*, the leading authority for the proposition that the tippee must have knowledge of the insider's personal benefit, Judge Rakoff recognized that misappropriation cases are different.  *Whitman*, 904 F. Supp. 2d at 370 (noting that, in contrast to classical cases, a "tippee's knowledge that disclosure of the inside information was unauthorized is sufficient for liability in a misappropriation case").  That is what we have here.  Accordingly, notwithstanding the imposition of a knowledge requirement in cases like *Whitman*, there can be no question that in a misappropriation case such as this one, remote tippees like Durant and Payton need not know of a benefit received by the tipper (Martin).

In any event, even if the defendants were correct that the Government must prove their knowledge of Martin's benefit at trial, they would still be incorrect that the Government must

explicitly plead such knowledge in the indictment. In *United States* v. *Rajaratnam*, No. 13 Cr. 211 (NRB), 2014 WL 1554078 (S.D.N.Y. Apr. 17, 2014), Judge Buchwald declined to dismiss the indictment for alleging only knowledge of a breach of fiduciary duty, and not specifically alleging knowledge of the benefit to a downstream tippee. As Judge Buchwald explained in rejecting the same argument advanced by the defendants here, "charging knowledge of a breach of fiduciary duty as was done here necessarily charges knowledge of a personal benefit, thus making the Indictment sufficient." *Id.* at *2. In *Whitman*, Judge Rakoff used identical reasoning to reject Whitman's motion to dismiss the indictment for failure to plead his knowledge of the tipper's personal benefit. *See Rajaratnam*, 2014 WL 1554078, at *2 (citing *Whitman* for support and noting that Judge Rakoff concluded that the indictment was sufficient because it alleged that the information was obtained in violation of duties of trust and confidence).[5]

    As such, the defendants' motion to dismiss the Indictment must be denied.

## II. THE INDICTMENT PROPERLY ALLEGES INSIDER TRADING BASED ON A MISAPPROPRIATION THEORY OF FRAUD

    The defendants also claim that the Indictment should be dismissed because it fails to properly allege insider trading based on a misappropriation theory of fraud. In particular, Payton argues (and Durant joins in his motion), that the Indictment does not contain the required allegation of deception because Martin disclosed to Attorney-1 that Martin traded on the Inside Information, such that, Payton argues, "the downstream tipper can no longer be held liable for his subsequent trades," because the "element of 'deception' is no longer operative." (Payton

---

[5]    Even if this Court were to instruct the jury that the Government was required to prove that the defendants knew that Martin received a benefit, the Government's trial proof would easily suffice. As Judge Rakoff held in *Whitman*, such a "benefit does not need to be financial or tangible in nature." 904 F. Supp. 2d at 371 n.7. Instead, "it could include, for example, maintaining a useful networking contact, improving the reputation or power within the company, obtaining future financial benefits, or just maintaining or furthering a friendship." *Id.* The Second Circuit in *United States* v. *Jiau* agreed, stating that a "'personal benefit' is broadly defined to include not only pecuniary gain, but also, *inter alia*, any reputational benefit that will translate into future earnings and the benefit one would obtain from simply making a gift of confidential information to a trading relative or friend." 734 F.3d 147, 153 (2d Cir. 2013) (internal ellipses, brackets, quotation marks, and citations omitted).

Mem. 2-3).  The defendants are wrong and their argument should be rejected.  Although Martin

did make a partial disclosure to Attorney-1, that he had personally traded on the Inside

Information, he did not make a full disclosure – including that he had passed the Inside

Information to the defendants and others, who then traded on it.  Thus, the Indictment alleges the

requisite element of "deception," on which the misappropriation theory is based, and sufficiently

alleges a claim of insider trading against both defendants.

Misappropriation cases like this one target "a fiduciary-turned-trader's deception of those

who entrusted him with access to confidential information."  *United States* v. *O'Hagan*, 521 U.S.

642, 652 (1997).  In this case, Martin was a trusted confidant of Attorney-1.  (Ind. ¶¶ 13-14).

Attorney-1 confided in Martin about his job, and, in so doing, shared Inside Information related

to the IBM/SPSS Transaction, which Attorney-1 expected that Martin would keep confidential.

(Ind. ¶ 17).  Instead, Martin tipped others, including Conradt, with the Inside Information, with

the expectation that Conradt would trade on the Inside Information.  (Ind. ¶ 22).  Conradt, in

turn, passed the Inside Information along to Durant and Payton, and others, including Weishaus

and CC-1.  (*Id.*).

Although Martin told Attorney-1 that he traded on the Inside Information and then sold

the majority of his SPSS securities (before taking advantage of the increase in stock price as a

result of the announcement of the IBM/SPSS Transaction), (Ind. ¶¶ 29-30), Payton's argument

that this disclosure by Martin somehow rendered inoperable the "deception," (Payton Mem. 3) is

unavailing.  Martin's disclosure to Attorney-1 was incomplete with respect to a crucial fact.

Martin did *not* tell Attorney-1 that he passed the Inside Information to Conradt.  Instead, Martin

only told Attorney-1 that he passed the Inside Information to Conradt in November 2010 – more

than a year later – and at the same time as the regulatory authorities' subsequent investigation

into trading surrounding the IBM/SPSS Transaction.  (Ind. ¶¶ 45-47).   The law is clear that in order for disclosure to cure a prior misappropriation, it must be full disclosure.  It is "*full disclosure* [which] forecloses liability under the misappropriation theory."  *O'Hagan*, 521 U.S. at 655 (emphasis added).  In this case, Martin's partial disclosure did not cure the conduct of downstream tippees, such as Durant, Payton, Weishaus, and CC-1, who traded on the Inside Information and reaped collective profits of approximately $1,000,000.  Thus, there was ongoing deception, even after Martin's disclosure, supporting the misappropriation theory of the fraud, and Payton's motion to dismiss the Indictment on this basis should be denied.

## III.   RULE 10B5-2(B)(2) FALLS WELL WITHIN THE SEC'S BROAD RULEMAKING AUTHORITY

The defendants next claim that the Indictment should be dismissed because Rule 10b5-2(b)(2), under which a duty of trust or confidence may arise from a history, pattern, or practice of sharing confidences, exceeds the SEC's rulemaking authority.  Similar challenges have been raised before other courts; all have been rejected.  Nonetheless, the defendants ask this Court to break new ground and invalidate a rule that has been in effect for well over a decade and that was promulgated pursuant to a valid delegation of rulemaking authority to the SEC.  For the reasons set forth below, the defendants' facial attack on Rule 10b5-2(b)(2) is meritless and should be rejected.

### A.   Applicable Law

The analysis begins with the language of the enabling statute.  Section 10(b) of the Securities and Exchange Act of 1934 makes it unlawful for any person:

> To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of *such rules and regulations as the [SEC] may prescribe as necessary or appropriate* in the public interest or for the protection of investors.

20

15 U.S.C. § 78j(b) (emphasis added); *see also* 15 U.S.C. § 78w(a) (broadly granting authority to the SEC to "have the power to make such rules and regulations as may be necessary or appropriate to implement the provision of this title").  In 1942, the SEC relied on this explicit delegation of rulemaking authority within Section 10(b) to promulgate Rule 10b-5.  That rule prohibits the use of "any device, scheme, or artifice to defraud," or "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(a) and (c).

Although neither Section 10(b) nor Rule 10b-5 mentions "insider trading," both provisions prohibit deception in connection with the purchase or sale of securities.  Accordingly, as set forth above, the Supreme Court has recognized that a person who obtains material nonpublic information and later tips or trades on the basis of that information, in breach of a duty to the information's source, acts with deception.  *See O'Hagan*, 521 U.S. at 661 (reviewing Section 10(b) and Rule 10b-5 and adopting the misappropriation theory of insider trading); *Dirks* v. *SEC*, 463 U.S. 646 (1983) (outlining the contours of the classical theory of insider trading).

In *O'Hagan*, the Court reviewed the text and history of Section 10(b) and Rule 10b-5 and, for the first time, blessed the misappropriation theory of insider trading.  In that case, O'Hagan was a lawyer who traded in the securities of a company that his client was targeting for a takeover.  *O'Hagan*, 521 U.S. at 653.  Under the classical theory of insider trading, because O'Hagan owed no duty to the shareholders of the target company, he had no duty to disclose or abstain from trading with those shareholders while in possession of material nonpublic information.  *Id.* at 653, n. 5.  The Supreme Court nonetheless found that O'Hagan's actions – misappropriating confidential information about a corporate takeover – breached a duty of trust and confidence that he owed to his law firm and his client.  *Id.* at 655, 659.  In so holding,

*O'Hagan* did not seek to define the boundaries of what types of relationships give rise to a duty under the newly-accepted misappropriation theory.  Instead, *O'Hagan* simply suggested, without elaboration, that only "recognized dut[ies]" will suffice in a misappropriation case.  *Id.* at 666; *see also id.* at 663 (stating that the misappropriation theory makes unlawful "trading on the basis of information that the wrongdoer converted to his own use in violation of some fiduciary, contractual, or similar obligation to the owner or rightful possessor of the information" (quoting Barbara Bader Aldave, <u>Misappropriation: A General Theory of Liability for Trading on Nonpublic Information</u>, 13 Hofstra L. Rev. 101, 122 (1984)).

In *O'Hagan*'s wake, "it remained unclear which nonfiduciary relationships carried a duty to disclose to the source."  *United States* v. *McGee*, 763 F.3d 304, 311 (3d Cir. 2014); *see SEC* v. *Yun*, 327 F.3d 1263, 1271 (11th Cir. 2003) (noting that, after *O'Hagan*, "it is unsettled whether non-business relationships, such as husband and wife, provide the duty of loyalty and confidentiality necessary to satisfy the misappropriation theory").  In response, the SEC issued Rule 10b5-2, which interprets Section 10(b) of the Exchange Act and addresses with particularity the scope of the misappropriation theory.  The rule, entitled "Duties of Trust or Confidence in Misappropriation Insider Trading Cases," provides a non-exclusive list of circumstances "in which a person has a duty of trust or confidence for purposes of the 'misappropriation' theory of insider trading under Section 10(b) of the [Exchange] Act and Rule 10b-5."  17 C.F.R. § 240.10b5-2 (preliminary note).   In proposing the rule, the SEC noted, among other things, the adoption the misappropriation theory by the Supreme Court in *O'Hagan* and the existence of conflicting common law precedents interpreting Section 10(b).  *See* Selective Disclosure and Insider Trading, Exchange Act Release 42,259, 64 Fed. Reg. 72,590, at 72,599-601 (proposed

Dec. 28, 1999) (hereinafter, "Proposing Release").  The SEC commented that neither it nor

Congress had

> expressly defined insider trading in a statute or rule.  Instead, insider trading law has developed on a case-by-case basis under the antifraud provisions of the federal securities laws, primarily Section 10(b) of the Exchange Act and Rule 10b-5.  As a result, from time to time there have been issues on which various courts have disagreed. . . .   Today's proposals address two issues on which disagreement remains.

Proposing Release at 72,600.  The SEC proposed, among other things, the adoption of the rules

that ultimately became Rule 10b5-2(b)(1)-(3).  And it noted that, even after *O'Hagan*, it "is not

as settled . . . under what circumstances certain non-business relationships, such as family and

personal relationships, may provide the duty of trust or confidence required under the

misappropriation theory."  Proposing Release at 72,602.

Accordingly, the final rule, which took effect on October 23, 2000, states that a "duty of

trust or confidence" exists in the following circumstances, among others:

> (1) Whenever a person agrees to maintain information in confidence;
>
> (2) Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality; or
>
> (3) Whenever a person receives or obtains material nonpublic information from his or her spouse, parent, child, or sibling; provided, however, that the person receiving or obtaining the information may demonstrate that no duty of trust or confidence existed with respect to the information, by establishing that he or she neither knew nor reasonably should have known that the person who was the source of the information expected that the person would keep the information confidential, because of the parties' history, pattern, or practice of sharing and maintaining

> confidences, and because there was no agreement or understanding
> to maintain the confidentiality of the information.

17 C.F.R. § 240.10b5-2(b)(1)-(3).

Rule 10b5-2(b)(2)'s validity is reviewed under the familiar two-step analytical

framework set forth in *Chevron U.S.A., Inc.*, v. *Natural Res. Def. Council, Inc.*, 467 U.S. 837

(1984); *see National Cable & Telecomm. Ass'n* v. *Brand X Internet Serv.*, 545 U.S. 967, 980-81

(2005); *United States* v. *Royer*, 549 F.3d 886, 899 (2d Cir. 2008) (Rakoff, J.) (declaring that

"SEC rules are entitled to *Chevron* deference" and applying such deference to SEC Rule 10b5-

1). Under *Chevron*'s first step, a court must determine "whether Congress has directly spoken to

the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for

the court, as well as the agency, must give effect to the unambiguously expressed intent of

Congress." *Chevron*, 467 U.S. at 842-43. However, if the statute's "plain terms" do not

"directly addres[s] the precise question at issue," then the agency is empowered to promulgate

rules that fill the gap. *Brand X*, 545 U.S. at 986 (quoting *Chevron*, 467 U.S. at 843).

Under the second step of the *Chevron* analysis, the court must determine whether the

SEC's interpretation is a "permissible" or "reasonable" construction of Section 10(b). *Chevron*,

467 U.S. at 843-44. A court may not set aside the SEC's reasonable interpretation in favor of an

alternatively plausible, or even better, interpretation. *See Brand X*, 545 U.S. at 980; *Chevron*,

467 U.S. at 843 n. 11 ("The court need not conclude that the agency construction was the only

one it permissibly could have adopted to uphold the construction, or even the reading the court

would have reached if the question initially had arisen in a judicial proceeding."). Instead, the

touchstone of *Chevron*'s second step is simply whether the agency's regulation is "arbitrary,

capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844; *Roth ex rel. Beacon*

*Power Corp*. v. *Perseus L.L.C.*, 522 F.3d 242, 249 (2d Cir. 2008) (granting *Chevron* deference

under Section 16(b) of the Exchange Act and noting that "SEC's views are entitled to 'controlling weight' unless the regulation is 'arbitrary, capricious, or manifestly contrary to the statute'").

**B.     Discussion**

**1.     Section 10(b) Does Not Address Which Relationships Give Rise to a Duty of Trust or Confidence**

The plain text of Section 10(b) is entirely silent with respect to what relationships give rise to a duty of trust or confidence in misappropriation cases.  That conclusion is no surprise.  After all, Section 10(b) does not mention the crime of insider trading, much less the duties that give rise to it.  The statute's silence on this point is not a defect; instead, it is an intentional feature of congressional design.  The Exchange Act's legislative history demonstrates that Congress, in fashioning a regulatory framework capable of keeping pace with deception within the marketplace, said no more than it needed.  *See, e.g.*, S. Rep. 73-792, at 5 (1934) ("[S]o delicate a mechanism as the modern stock exchange cannot be regulated efficiently under a rigid statutory program."); *id*. at 18 (noting that Congress intended Section 10(b) to be a bulwark against "*any*. . . manipulative or deceptive practices which [*the SEC*] finds detrimental to the interests of the investor") (emphasis added)).  The Supreme Court has explained that "Section 10(b) was designed as a catch-all clause to prevent fraudulent practices" and has commented that "neither the legislative history nor the statute itself affords specific guidance" on the metes and bounds of what constitutes a manipulative or deceptive device.  *Chiarella*, 445 U.S. at 226; *see also SEC* v. *Zandford*, 535 U.S. 813, 819 (2002) (Section 10(b) should be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes"); *McGee*, 763 F.3d at 314-15 (holding that Rule 10b5-2(b)(2) was lawfully promulgated and explaining that "the Supreme Court has recognized that the text of § 10(b) is ambiguous" and "simply has not held

that misappropriation requires a fiduciary relationship or that its interpretation follows from the unambiguous terms of § 10(b)").

Because the plain text of Section 10(b) does not speak directly to the issue at hand, the statute does not unambiguously foreclose the SEC from exercising its authority to promulgate rules to combat deceptive insider trading practices where the material nonpublic information emanates from a source who, based on a history of sharing confidences, expects the recipient to maintain its confidentiality. Accordingly, Rule 10b5-2(b)(2) easily clears the first step in the *Chevron* analysis.

### 2. *United States* v. *Chestman* Does Not Foreclose Rule 10b5-2(b)(2)

The defendants concede that Section 10(b)'s text is "somewhat opaque" and that "statute ambiguity may itself be considered a delegation of interpretive authority to the implementing administrative agency" under *Chevron*. (Durant Mem. at 20). They nevertheless insist that *Chevron* deference is inappropriate because *United States* v. *Chestman*, 947 F.2d 551 (2d Cir. 1991), foreclosed Rule 10b5-2(b)(2) and that therefore the rule must be limited to *Chestman*'s holding. (Durant Mem. at 22). That argument misreads *Chestman* and is contrary to the Supreme Court's instructions in *Brand X*.

In *Chestman*, a criminal case that predated both *O'Hagan* and Rule 10b5-2 and that involved the passage of material nonpublic information between spouses, the Second Circuit held that a recognized duty giving rise to misappropriation liability can be established either by acceptance of a duty (an agreement), or through a fiduciary-like relationship of trust and confidence. *Chestman*, 947 F.2d at 568. *Chestman* concluded, based on the evidence adduced at trial, that the husband and wife in that case were neither in a fiduciary relationship nor in a "fiduciary-like" relationship marked by superiority or dominance. *Id.* at 570. The Court further

26

explained that "the repeated disclosure of business secrets between family members may substitute for a factual finding of dependence and influence and thereby sustain a finding of the functional equivalent of a fiduciary relationship."  *Id.* at 569.  But the evidence at trial was insufficient to meet this threshold because, although there was testimony that the spouses "shared and maintained generic confidences before[,] [t]he jury was not told the nature of these past disclosures and therefore it could not reasonably find a relationship that inspired fiduciary, rather than normal marital, obligations."  *Id.* at 571.  Critically, the *Chestman* court did not ground its holding in the plain text of Section 10(b).  Instead, the Court of Appeals openly declared that it found support *outside* the statute: "We take our cues as to what *is* required to create the requisite relationship from the securities fraud precedents and the common law."  *Chestman*, 947 F.2d at 568 (emphasis in original); *see also United States* v. *Whitman*, 904 F. Supp. 2d at 370 (discussing *Chestman*'s explicit reliance on common law).

In *Brand X*, the Supreme Court explained the interplay between *stare decisis* principles and *Chevron* deference that would otherwise apply to a reasonable agency interpretation of an ambiguous statute.  The Court held that a "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."  *Brand X*, 545 U.S. at 982.  The Court then explained its reasoning:

> This principle follows from *Chevron* itself.  *Chevron* established a "presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows."  Yet allowing a judicial precedent to foreclose an agency from interpreting an ambiguous statute, as the Court of Appeals assumed it could, would allow a court's interpretation to override an agency's.  *Chevron*'s premise is that it is for agencies, not courts, to fill statutory gaps.

*Id.* (internal citation omitted).  The Court went on to announce that prior judicial precedents would be rigorously scrutinized before allowing them to overrule an agency interpretation. *Brand X* declared: "The better rule is to hold judicial interpretations contained in precedents to the same demanding *Chevron* step one standard that applies if the court is reviewing the agency's construction on a blank slate: Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction."  *Id.* at 982-83.  The *Brand X* Court explained why a contrary rule would lead to "haphazard results":

> [It] would mean that whether an agency's interpretation of
> an ambiguous statute is entitled to *Chevron* deference
> would turn on the order in which the interpretations issue:
> If the court's construction came first, its construction would
> prevail, whereas if the agency's came first, the agency's
> construction would command *Chevron* deference. Yet
> whether Congress has delegated to an agency the authority
> to interpret a statute does not depend on the order in which
> the judicial and administrative constructions occur.

*Id.* at 983.  Put differently, either Congress delegated rulemaking authority, or it did not.  But the answer manifestly does not turn on the accident of timing.

When scrutinized under *Brand X*'s "demanding" standard, *Chestman* clearly did not hold that its construction of misappropriation liability "follows from the unambiguous terms of the statute."  *Id.* at 982.  Instead, by plainly stating that it was taking its "cues" from "securities fraud precedents and the common law," as opposed to congressional intent and the statutory text, *Chestman* declared the exact opposite.  *Chestman*, 947 F.2d at 568.  Tellingly, chief among *Chestman*'s common law guideposts was *Chiarella* – a case in which the Supreme Court recognized that Section 10(b) shed scant light on what qualified as a manipulative or deceptive device.  *See Chiarella*, 445 U.S. at 226 ("[Section] 10(b) does not state whether [or when]

28

silence may constitute a manipulative or deceptive device. . .  [and] neither the legislative history nor the statute itself affords specific guidance. . . ."); *McGee*, 763 F.3d at 314 (noting that, in *Chiarella*, "the Supreme Court . . . recognized that the text of § 10(b) is ambiguous"). Finally, in reaching its holding, *Chestman* repeatedly emphasized that it sought to explain the "interstitial gaps of [Rule 10b-5]," a rule that the SEC promulgated to interpret Section 10(b)'s ambiguous text.  *Chestman*, 947 F.2d at 564; *id.* at 565 (explaining the "strands of Rule 10b-5 liability" under *Dirks*); *id.* at 566 (noting the "second general theory of Rule 10b-5 liability, the misappropriation theory"); *id.* at 567 ("[W]e turn to our central inquiry—what constitutes a fiduciary or similar relationship of trust and confidence in the context of Rule 10b-5 criminal liability?").

In sum, *Chestman* is a case that used common law precedents to interpret a facially ambiguous rule – Rule 10b-5 – that itself interpreted a facially ambiguous statute – Section 10(b).  At no point did *Chestman* state that it was relying on the text of Section 10(b) to reach its conclusion.  As a result, *Chestman* does not foreclose the SEC's subsequent promulgation of Rule 10b5-2(b)(2), even if that rule sweeps more broadly than that which *Chestman* had contemplated nearly a decade earlier.[6]

Adopting the defendants' contrary argument would lead to the kind of "haphazard" and "anomalous" result that *Brand X* rejected—the possibility that Section 10(b)'s meaning would turn on who interpreted it first (the Second Circuit or the SEC) instead of whether Congress left a

---

[6]      Contrary to the defendants' argument, *Chestman* did not rely on the rule of lenity (or any other canon of statutory interpretation) to conclude that Section 10(b)'s text was unambiguous.  Instead, *Chestman* simply referenced the rule of lenity to reject the "suitable occasion" test (urged by some courts and scholars) whereby confidential relations giving rise to a duty of trust and confidence are not defined at all but instead are applied flexibly whenever a "suitable occasion" arises.  *See Chestman*, 947 F.2d at 569 (citing *United States* v. *Reed*, 601 F.Supp. 685 (S.D.N.Y.), *rev'd on other grounds*, 773 F.2d 477 (2d Cir. 1985), and G.G. Bogert, *The Law of Trusts and Trustees* § 482, at 284-86 (Rev. 2d ed. 1978)).  Rule 10b5-2(b)(2), promulgated after an extensive period of notice and comment deliberation, bears no relation to an *ad hoc*, undefined "suitable occasion" test that, in *Chestman*'s view, would offend the rule of lenity and due process.  *Id.*  Instead, by issuing rules that specify when nonbusiness relationships may yield a duty of trust and confidence, the SEC has brought clarity to this area of law.

gap for the expert agency to fill.  *See Brand X*, 545 U.S. at 983.  Rule 10b5-2(b)(2) would then

mean one thing in the Second Circuit—because *Chestman* came first in time—and something

entirely different in other circuits.  Such a result would be flatly inconsistent with congressional

intent in the Exchange Act.  *Cf. United States* v. *Whitman*, 904 F.Supp.2d at 369 ("[N]othing in

the [Securities Exchange Act of 1934] suggests that its requirements were designed to vary from

state to state.  On the contrary, its purpose was to provide full, and uniform, disclosure

throughout the national securities markets."); *id*. at 369 n.5 (commenting that "the SEC has

promulgated a rule—Rule 10b5-2—that is uniform throughout the United States").

### 3.  Rule 10b5-2(b)(2) is a Reasonable Interpretation of Section 10(b)

Under *Chevron*'s second step, the inquiry turns to whether the SEC's interpretation of

Section 10(b) is "permissible" or "reasonable" in light of Congress's mandate to prohibit "any

deceptive device or contrivance."  *Chevron*, 467 U.S. at 843-44.  To decide the question, this

Court "need not conclude that the agency construction was the only one it permissibly could

have adopted to uphold the construction, or even the reading the court would have reached."  *Id.*

at 843, n. 11.

By any reckoning, Rule 10b5-2(b)(2) easily satisfies *Chevron*'s reasonableness review.

The rule advances Congress's clear intent to prevent deception in the purchase or sale of

securities by clarifying certain types of relationships that can give rise to a duty of trust or

confidence, such that trading on the material nonpublic information provided by the source

"defrauds the principal of the exclusive use of that information."  *O'Hagan*, 521 U.S. at 652; *see*

*id.* at 653-54 ("A fiduciary who pretends loyalty to the principal while secretly converting the

principal's information for personal gain dupes or defrauds the principal" (quotation marks and

citation omitted)).  The rule is also faithful to "an animating purpose of the Exchange Act: to

insure honest securities markets and thereby promote investor confidence." *Id.* at 658 (citing 45 Fed. Reg. 60412 (1980)).  As *O'Hagan* explained, without vigorous enforcement of unlawful misappropriation, "investors likely would hesitate to venture their capital in a market where trading based on misappropriated nonpublic information is unchecked by law." *Id.*  And as the Third Circuit recently declared, "Rule 10b5-2(b)(2) provides a basis to hold such misappropriators accountable." *McGee*, 763 F.3d at 316.[7]

Two recent cases, *United States* v. *Corbin*, 729 F.Supp.2d 607 (S.D.N.Y. 2010), and *United States* v. *McGee*, considered and rejected similar defense challenges to the SEC's authority to promulgate Rule 10b5-2.  In *Corbin*, the defendant argued that the SEC exceeded its authority in enacting the entirety of Rule 10b5-2 or, in the alternative, that the entire rule was unconstitutional.  Judge Marrero, in a careful opinion that traced the development of insider trading law generally and misappropriation liability specifically, was not persuaded.  *See Corbin*, 729 F. Supp. 2d at 617 ("Corbin's arguments are not compelling.").  *Corbin* first determined, at *Chevron* step one, that "[Section] 10(b) does not directly address the scope of duties that, if breached through deception, may give rise to misappropriation liability.  Accordingly, the Court concludes that Congress has not 'unambiguously forbidden' the SEC interpretation of § 10(b) embodied in Rule 10b5-2." *Id.* at 618 (citing *Northpoint Technology* v. *FCC*, 414 F.3d 61, 69 (D.C. Cir. 2005).  *Corbin* next concluded, at *Chevron* step two, that Rule 10b5-2 was a reasonable interpretation of Section 10(b):

> [T]he Court finds that the SEC's exercise of its rulemaking authority to promulgate Rule 10b5-2 under § 10(b) is far from

---

[7]     The defendants also suggest that Rule 10b5-2(b)(2) is foreclosed by *Chestman* because the rule allows for the unilateral imposition of a duty of trust or confidence.  (Durant Mem. at 21).  That is incorrect.  The rule recognizes duties that are based on a "history, pattern, or practice of sharing confidences," not a person's unilateral expectation of confidentiality.  The defendants' objection is more properly viewed as a challenge to the rule's allowance for *unspoken* expectations of confidentiality.  But *Chestman* does not require explicit acceptance before a duty of confidentiality can exist.  *See Chestman*, 947 F.2d at 571 (explaining that "acceptance may be implied" from a "pre-existing fiduciary-like relationship between the parties").

> arbitrary, capricious, or contrary to § 10(b). Rather, it was buttressed by a thorough and careful consideration—one that far surpasses mere reasonableness—of the ends of § 10(b), the state of the current insider trading case law which included Supreme Court and Second Circuit decisions, and the need to protect investors and the market generally. Accordingly, the Court concludes that the SEC's construction of § 10(b) embodied in Rule 10b5-2 is based on a permissible construction of the statute.

*Id.* at 619 (quotation marks and citation omitted).

In *McGee*, the Third Circuit endorsed *Corbin*'s holding, echoed its reasoning, and similarly concluded that Rule 10b5-2(b)(2) was a reasonable exercise of the SEC's rulemaking authority. The *McGee* court declared that "the Supreme Court did not set the contours of a relationship of 'trust and confidence' giving rise to the duty to disclose or abstain and misappropriation liability. . . . Accordingly, the imposition of a duty to disclose under Rule 10b5-2(b)(2) when parties have a history, pattern or practice of sharing confidences does not conflict with Supreme Court precedent." 763 F.3d at 314 (internal quotation marks and citations omitted). Much like the defendants' reliance on *Chestman*, the defendant in *McGee* rested his argument on the notion that Rule 10b5-2(b)(2) conflicted with and was therefore foreclosed by a prior judicial precedent, specifically, *O'Hagan*. The Third Circuit disagreed and explained that "even if the rule were to conflict with the [Supreme] Court's interpretation of deceptive devices, the Court 'did not purport to adopt or apply the unambiguous meaning' of § 10." *Id.* (quoting *Swallows Holding Ltd.* v. *Comm'r*, 515 F.3d 162, 170, n.11 (3d Cir. 2008), and citing *Brand X*, 545 U.S. at 982). Accordingly, the court in *McGee* affirmed Rule 10b5-2(b)(2) as reasonable under *Chevron*, and not foreclosed by Supreme Court precedent interpreting Section 10(b).

In sum, in moving to invalidate Rule 10b5-2(b)(2), the defendants ask this Court to adopt a position that other courts rightly have rejected.  The Court should decline the invitation and hold that Rule 10b5-2(b)(2) fits well within the SEC's rulemaking authority.[8]

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court deny the defendants' motions to dismiss the Indictment in their entirety.

Dated:  November 3, 2014
        New York, New York

                                Respectfully submitted,

                                PREET BHARARA
                                United States Attorney


                        By:  ___//s//_____
                                Jessica Masella
                                Andrew Bauer
                                Damian Williams
                                Assistant United States Attorneys
                                Tel. No.: (212) 637-2288/2354/2298

---

[8]     Even if Rule 10b5-2(b)(2) were limited to *Chestman*'s holding (an outcome which would be manifestly incorrect), the defendants would not escape criminal liability.  As alleged in the Indictment, the relationship between Attorney-1 and Martin involved the repeated exchange of personal as well as business confidences, (Ind. ¶¶ 13-14), which under *Chestman* is sufficient to give rise to a duty of trust or confidence.  *See Chestman*, 947 F.2d at 569.