UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
UNITED STATES OF AMERICA                 S3 12 Cr. 887 (ALC)
                                                    :
            - v. -
                                                    :
BENJAMIN DURANT,
                                                    :
                  Defendant.
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S MOTIONS IN LIMINE


                                         PREET BHARARA
                                         United States Attorney for the
                                         Southern District of New York
                                         Attorney for the United States
                                             of America.


Jessica Masella
Andrew Bauer
Damian Williams
Assistant United States Attorneys
        – Of Counsel –

## PRELIMINARY STATEMENT

The Government hereby makes the following motions *in limine* with respect to the trial of Benjamin Durant, which is scheduled to begin on December 8, 2014.  Specifically, the Government seeks:

1.      An order allowing the Government to introduce certain statements by an individual (referenced herein as "Attorney-1"), through the testimony of another witness, Trent Martin, which statements are not hearsay;

2.      An order allowing the Government to introduce two recorded telephone calls made by co-conspirator Daryl Payton;

3.      An order allowing the Government to introduce the responses of three co-conspirators (Daryl Payton, David Weishaus, and CC-1) to two questionnaires issued by the securities trading firm at which they were working, relating to the conduct at issue in this case;

4.      An order precluding the defendant from cross-examining cooperating witnesses about certain instances of conduct, including instant message correspondence, which is not related to the conduct in this case; and

5.      An order precluding the defense from making certain arguments, or offering certain evidence at trial, with regards to penalties faced by the defendant, prosecutorial motive, or reasons why the defendant's conduct, even if criminal, should be excused.

## STATEMENT OF FACTS

Benjamin Durant is charged in Indictment S3 12 Cr. 887 (ALC) (the "Indictment") in Count One with conspiracy to commit securities fraud based on his participation in an insider trading scheme from in or about June 2009 through in or about July 2009, and in Counts Two and Three with substantive securities fraud violations based on insider

trading.  The charges in the Indictment stem from an insider trading scheme in which Benjamin Durant and others obtained material nonpublic information relating to a potential corporate acquisition for the purpose of executing profitable securities transactions ahead of the public announcement of that acquisition.

More specifically, the Indictment alleges that Durant was a stock broker in the Manhattan office of a Connecticut-based securities trading firm ("Securities Trading Firm-1") during June and July of 2009.  (Ind. ¶¶ 1-9).  Thomas Conradt, David Weishaus, Daryl Payton and another co-conspirator not charged as a defendant ("CC-1") were also stock brokers at the Securities Trading Firm-1 during the same time period.  Trent Martin, an Australian-born equity salesman for a financial services firm, was Conradt's roommate and friend in June and July 2009.  (*Id*.).  Finally, during this same time period, Attorney-1, a citizen of New Zealand, was an associate at a large New York-based law firm (the "New York Law Firm").  (*Id*.).

Martin and Attorney-1 were close friends who had a history, pattern and practice of sharing confidences with each other relating to their careers, families, relationships, and plans for the future.  (Ind. ¶ 13).  In addition, they sought advice from each other and shared common interests, a common cultural background, and the common experience of being single men who worked in demanding industries and lived far from their home countries.  (*Id*.).  During 2008 and 2009, Attorney-1 and Martin exchanged personal confidences as well as nonpublic information concerning their jobs.  (Ind. ¶ 14).

As set forth in the Indictment, beginning in the spring of 2009, the New York Law Firm represented International Business Machines ("IBM") in connection with an offer by IBM to acquire SPSS, Inc. ("SPSS"), a smaller publicly-traded software company (the "IBM/SPSS Transaction").  (Ind. ¶ 15).  On May 26, 2009, Attorney-1 was assigned to work on

the IBM/SPSS Transaction, which was confidential at that time, and, as such, Attorney-1 was privy to material nonpublic inside information related to the IBM/SPSS Transaction (the "Inside Information"). (Ind. ¶ 16). During the course of his work on the IBM/SPSS Transaction, Attorney-1 learned, among other things, the names of the parties involved, the nature of the transaction, and the share price at which IBM proposed to purchase SPSS. (*Id.*).

On May 31, 2009, several days after beginning work on the IBM/SPSS Transaction, Attorney-1 met his close friend Martin for brunch. (Ind. ¶ 17). During that meeting, Attorney-1 confided in Martin regarding the stress that he was experiencing in his job at the New York Law Firm, and shared certain details of the IBM/SPSS Transaction with Martin, including the fact that IBM had offered to buy SPSS and that the offering price would be at a significant premium to the current market price for SPSS. (Ind. ¶¶ 17-18). At that time, this information was not publicly known, and Martin understood that Attorney-1 expected that he (Martin) would keep the information confidential based on their history, pattern and practice of sharing confidences. (Ind. ¶¶ 18-19).

After learning about the IBM/SPSS Transaction from Attorney-1, Martin purchased SPSS common stock and SPSS call option contracts. (Ind. ¶ 20).[1] Subsequently, Martin told Conradt about the IBM/SPSS Transaction, and Conradt passed the information to Weishaus, CC-1, Payton and defendant Durant. (Ind. ¶ 22). Thereafter, Durant, as well as Payton, Weishaus and CC-1, purchased SPSS call option contracts with expiration dates in August and September 2009. (Ind. ¶¶ 23-24, 27). Conradt purchased SPSS common stock, and Martin purchased SPSS call options and SPSS common stock. (Ind. ¶¶ 25, 26, 28).

---

[1]  A call option contract gives the holder an option to purchase common stock at a price specified in the contract, at any time up to the expiration date of the option. In this case, the defendant and his co-conspirators purchased call options at prices higher than the current stock price of SPSS, with expiration dates after the anticipated acquisition by IBM, which have value only if the price of SPSS stock increased before the expiration date of the call option contracts.

In late July and before the public announcement of the IBM/SPSS Transaction, Martin told Attorney-1 that Martin had purchased stock and call option contracts in SPSS on the basis of the Inside Information provided to Martin by Attorney-1.  (Ind. ¶ 29).  Attorney-1 was upset with Martin, and he told Martin that he should sell his SPSS call options and stock immediately.  (*Id*.).  On July 24, 2009, Martin sold all of his SPSS call option contracts and the majority of his SPSS stock.  (Ind. ¶ 30).  Martin did not tell Attorney-1 that he had disclosed the Inside Information about the IBM/SPSS Transaction to others, including Conradt, at that time.  Instead, Martin told Attorney-1 in November 2010 – over a year later – that he had passed the Inside Information to Conradt.  (Ind. ¶ 47).

On July 28, 2009, IBM and SPSS publicly announced the IBM/SPSS Transaction. (Ind. ¶ 31).  The same day as the public announcement, SPSS's share price increased more than 40% over the prior day's closing price.  (*Id*.).  Several hours after the announcement, Durant, Conradt, and CC-1 went to lunch together at a restaurant near their office.  (Ind. ¶ 32).  During that lunch, CC-1 discussed, among other things, the fact that he had sought legal advice in connection with his trading in SPSS.  (*Id*.).  Durant paid for everyone's lunch, but stated that he would pay in cash, so as not to generate a record of their lunch meeting.  (*Id*.).  Later that night, Durant met with Payton, Conradt, Weishaus, and CC-1 at a hotel in Manhattan.  (Ind. ¶ 33). During that meeting, the defendant and the others discussed their trading in SPSS securities, how much money they had made trading in advance of the announcement of the IBM/SPSS Transaction, and the fact that, if anyone asked about their trading, they should simply say that they liked technology stocks.  (*Id*.).

A few days after the announcement of the IBM/SPSS Transaction and before selling his SPSS call options, Payton transferred his SPSS call options from his account at

Securities Trading Firm-1 to two different accounts that he had just opened at Interactive Brokers.  (Ind. ¶ 36).  In the course of opening his account at Interactive Brokers, via a July 30, 2009 telephone call that was recorded, Payton lied about his employment, stating that he was a "self-employed real estate consultant" rather than a stock broker at Securities Trading Firm-1. (*Id.*).  During the same call, a representative from Interactive Brokers told Payton that if he worked at a broker/dealer, duplicate account statements might have to be sent to his employer. (*Id.*).

In November 2009, Securities Trading Firm-1 conducted an internal investigation into the trading of SPSS securities by Durant and others.  (Ind. ¶ 41).  In connection with that investigation, Durant, Payton, Weishaus, and CC-1 completed written questionnaires related to their trading in SPSS securities.  (*Id.*).  In completing his questionnaire, Durant stated that he purchased SPSS securities based on his own research from various publicly available sources, and he did not mention that he had heard about the IBM/SPSS Transaction from Conradt or anyone else.  (Ind. ¶ 42).  In completing his questionnaire, Payton stated that he had heard about SPSS from Durant, who told him that the company was a technology company with possible "near term upside," and Payton did not mention that he had heard about the IBM/SPSS Transaction from Conradt or anyone else.  (Ind. ¶ 43).  After reviewing the answers, Securities Trading Firm-1 asked Durant and the others to complete an additional questionnaire relating to their trading in SPSS securities, but Durant and each of the others refused to answer additional questions.  (Ind. ¶ 44).

## DISCUSSION

### I. CERTAIN STATEMENTS OF ATTORNEY-1 SHOULD BE ADMITTED AT TRIAL

The Government seeks an order permitting it to elicit certain statements by Attorney-1 through the testimony of Trent Martin.  For the reasons set forth below the statements are admissible.

As set forth in the Indictment, Trent Martin, was a close friend of Attorney-1's, and the two shared a history, pattern and practice of sharing confidences with each other.  (*See*, *e.g.*, Ind. ¶¶ 13, 14, 17).  Martin engaged in insider trading relating to the IBM/SPSS Transaction, and he pleaded guilty to conspiracy to do so, pursuant to a cooperation agreement with the Government.  The Government expects to call Martin as a witness at trial.  Attorney-1 is not subject to any agreement with the Government, and he currently resides and works in London, England.  Through counsel, Attorney-1 has informed the Government that he does not intend to make himself available to testify at trial.

At trial, the Government expects to seek to admit certain statements of Attorney-1, through the testimony of Martin, summarized below.  These statements, which sit at the center of the Government's case, are either not hearsay, or are admissible pursuant to one of the hearsay exceptions, as follows:

### Attorney-1's Statements About the IBM/SPSS Transaction

Martin is expected to testify that, on two occasions (one in May 2009 and one in July 2009), he spoke to Attorney-1 about the IBM/SPSS Transaction.  During the first conversation, Attorney-1 told Martin about the IBM/SPSS Transaction, including identifying both parties, estimating the likely price per share for the transaction, and estimating the timing of the transaction.  During the second conversation, Attorney-1 updated Martin with more specific

6

information about the timing and price of the IBM/SPSS Transaction.  Following these

conversations, Martin passed the information to his roommate, Thomas Conradt.  Both Martin

and Conradt traded on the information, and Conradt also passed the information along to Durant

and other co-conspirators, who also traded on the information.

   At trial, the Government will seek to admit Martin's testimony about the

statements of Attorney-1 during these two conversations.  These statements are admissible, as

non-hearsay, because they are not being offered for their truth.  Hearsay is a statement by a non-

testifying declarant offered "to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).

Here, these statements are not offered for their truth (*e.g.*, to show that IBM was in fact

contemplating a takeover of SPSS on a certain date and at a certain price).  Instead, they are

being offered to show that Attorney-1 transmitted confidential deal information to Martin, and to

explain Martin's subsequent actions, including that he personally traded on the information as

well as passed it along to others.  The Government intends to call another witness at trial, another

lawyer who was also working on the IBM/SPSS Transaction with Attorney-1 at the New York

Law Firm, who can testify about the details of the IBM/SPSS Transaction in order to establish as

true the central facts of the deal.  Therefore, Attorney-1's statements to Martin are admissible,

not for their truth, but because the significance of the statements lies in the fact that they were

made.  *United States* v. *Cardascia*, 951 F.2d 474, 486 (2d Cir. 1991) ("Under the Federal Rules

of Evidence, '[i]f the significance of an offered statement lies solely in the fact that it was made,

no issue is raised as to the truth of anything asserted, [then] the statement is not hearsay.'")

(quoting Fed. R. Evid. 801(c), advisory committee note).

### Attorney-1's Reactions to Martin's Confessions

On two occasions, Martin confessed to Attorney-1 relating to his trading in SPSS and to his passing information from Attorney-1 about the IBM/SPSS Transaction to Conradt. In particular, in July 2009, Martin confessed to Attorney-1 that Martin himself had traded in SPSS securities based on the information conveyed by Attorney-1 to Martin. Attorney-1 reacted by being upset and disappointed in Martin. In November 2010, during the course of the regulators' investigation into trading in SPSS, Martin told Attorney-1 that, in addition to trading himself, he had told Conradt about the transaction. Attorney-1 again reacted by being upset and disappointed.

At trial, the Government will seek to introduce Martin's testimony about Attorney-1's reaction to Martin's confessions on these two occasions. Attorney-1's statements reacting to Martin's confessions on these two occasions are not excluded by the hearsay rule. The Federal Rules of Evidence expressly permit certain types of statements, such as a "statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)." Fed. R. Evid. 803(3). Attorney-1's reaction to Martin's confession, which demonstrates Attorney-1's state of mind – including that he was disappointed and upset with Martin's conduct – is relevant to show that Attorney-1 felt betrayed by Martin and thus to further establish their relationship as one of sharing confidences. Pursuant to Rule 803(3), these statements are admissible.

### Attorney-1's Statements About Other Deals He Worked On

The Government will also seek to introduce testimony by Martin as to statements made by Attorney-1 about other transactions that he worked on at the New York Law Firm. In

particular, before telling Martin about the IBM/SPSS Transaction, Attorney-1 previously confided in Martin that Attorney-1 was working on a bond deal.

These statements are not being offered for their truth, so they are not hearsay.  *See* Fed. R. Evid. 801(c) (hearsay is a statement by a non-testifying declarant offered "to prove the truth of the matter asserted").  Instead, the Government offers Attorney-1's statements about his other work at the New York Law Firm, including the bond deal, to establish additional examples of occasions on which Attorney-1 and Martin shared confidences.  "Under the Federal Rules of Evidence, '[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, [then] the statement is not hearsay.'" *Cardascia*, 951 F.2d at 486 (quoting Fed. R. Evid. 801(c), advisory committee note).

## II.    Recorded Calls By Co-Conspirator Daryl Payton

At trial, the Government will seek to introduce the recordings of two calls made by co-conspirator Daryl Payton.  As set forth in the Indictment, prior to selling his SPSS call options, Payton transferred all of his SPSS call options held in his trading account at Securities Trading Firm-1 to two securities accounts that he opened at another securities trading firm, Interactive Brokers, in late July and early August 2009.  (Ind. ¶ 36).  In connection with opening his accounts at Interactive Brokers, Payton made two telephone calls, on July 30, 2009 and August 4, 2009, each of which were recorded in the normal course by that broker firm.  (*Id.*). During the course of his calls with Interactive Brokers, Payton lied about his employment.  (*Id.*). Specifically, Payton stated that he was a "self-employed real estate consultant," rather than a stock broker.  (*Id.*).  During that call, Payton was informed that if he were working at a broker/dealer, copies of his account statements would have to be sent to his employer.  (*Id.*).

The Government seeks to introduce these recorded calls at trial.  As a threshold matter, the recorded calls are not hearsay because they are not being offered to prove the truth of the matters asserted. Payton, after all, is lying in the recorded calls.  Furthermore, the calls are not hearsay because they are statements of Durant's co-conspirator, Payton, in furtherance of the charged conspiracy.  *See* Fed.R.Evid. 801(d)(2)(E) (defining as "not hearsay" any statement "offered against an opposing party" which "was made by the party's coconspirator during and in furtherance of the conspiracy).  On July 30, 2009, when Payton lied to Interactive Brokers, the object of the conspiracy to commit insider trading had not yet been achieved.  Indeed, the conspiracy's illicit trading in SPSS securities did not cease until at least September 2009, when Durant exercised his SPSS stock/options.  Accordingly, by lying to Interactive Brokers, Payton simply acted to ensure the conspiracy's success by protecting it from detection and ensuring that the conspiracy's illicit profits could be realized by him and his co-conspirators.

Payton's actions are also consistent with the explicit agreement among Durant and his co-conspirators' to cover up their insider trading.  As set forth in the Indictment, the group met on the evening of the public announcement of the IBM/SPSS Transaction, and, during that meeting, they discussed a cover story for their trading activity.  (Ind. ¶ 33).  Similarly, Payton's actions in opening two new securities trading accounts – and lying about his employment – were actions taken by Payton to cover up his trading in SPSS, so that he could prevent his supervisors at the Securities Trading Firm-1 from finding out about his SPSS trading activity.[2]  It is clear that the discovery of SPSS trading activity as to one co-conspirator would jeopardize the entire conspiracy. Durant, Payton, Weishaus, and CC-1 all knew each other and worked together as stock brokers at Securities Trading Firm-1. Accordingly, evidence of their

---

[2]       The evidence at trial will establish that Securities Trading Firm-1 maintained a policy that required its brokers to disclose all personal securities accounts to Securities Trading Firm-1.

concerted trading in SPSS naturally would attract the attention of regulators and the criminal authorities. Payton's statements made during the recorded phone calls were thus statements in furtherance of both the charged conspiracy to commit insider trading, in which Durant participated, and the conspiracy to cover up the group's illegal trading in SPSS securities, a conspiracy that is factually intertwined with the charged offense. For these reasons, Payton's recorded calls should be admitted at trial. *See, e.g.*, *United States* v. *Vargo*, 185 Fed. Appx. 111, 115 (2d Cir. 2006) (a statement in furtherance of a conspiracy to "cover up" the underlying crime is admissible under Fed.R.Evid. 801(d)(2)(E) where the declarant and the defendant are members of a conspiracy and that conspiracy is "factually intertwined" with the charged offense) (citing *United States* v. *Stratton*, 779 F.2d 820, 829 (2d Cir. 1985).

### III. Co-Conspirators' Questionnaires Regarding Trading in SPSS Securities

As set forth in the Indictment, in or about November 2009, Securities Trading Firm-1 conducted an internal investigation into the trading of SPSS securities done by Durant, Payton, Weishaus, and CC-1. (Ind. ¶ 41). As part of that investigation, Securities Trading Firm-1 distributed questionnaires to these individuals, each of whom was employed as a stock broker at that firm. (*Id*.). Durant and the others filled out the first questionnaire. (Ind. ¶ 42). Durant and the others did not mention that they heard of SPSS from Conradt or had any information about the IBM/SPSS Transaction before trading. (Ind. ¶ 43). Subsequently, Securities Trading Firm-1 administered a second questionnaire to Durant and the others. (Ind. ¶ 44). Durant and his co-conspirators refused to answer any additional questions relating to their trading in SPSS securities. (*Id*.). The Government intends to introduce Durant's questionnaire, as well as his refusal to answer the second questionnaire; such statements are admissible and are not hearsay

because they are admissions of the defendant (the Government's party opponent). *See* Fed. R. Evid. 801(d)(2).

In addition, the Government seeks to introduce the statements of the other co-conspirators, including Payton, Weishaus, and CC-1, as well as their refusal to answer the second questionnaire. These statements are admissible pursuant to Federal Rule of Evidence 801(d)(2)(E) as co-conspirator statements in furtherance of the conspiracy to cover up the group's illegal insider trading. As with Payton's recorded phone calls to establish his accounts at Interactive Brokers, Durant's co-conspirators, by their answers to the first questionnaire and refusal to answer the second questionnaire, all sought to cover up their insider trading in SPSS securities. Their statements concealing their insider trading conspiracy are in furtherance of the cover-up conspiracy, one which is "factually intertwined" with the conduct charged in the instant case. As such, it is admissible. Fed. R. Evid. 801(d)(2)(E); *see also Vargo*, 185 Fed. Appx. at 115; *Stratton*, 779 F.2d at 829.

### IV.   Cooperating Witnesses' Other Instances of Conduct

The Government seeks to preclude cross-examination of certain cooperating witnesses with respect to other conduct that is not relevant to the subject of the case and is not relevant to the witnesses' credibility. In particular, several of the cooperating witnesses participated in "instant message" conversations with other individuals, during which they used graphic, misogynistic, and/or sexist language about others. For example:

- in one instant message comment during 2007, one of the Government's witnesses wrote "god, I wanna rock this little bitch out"

- in another instant message comment during 2008, one of the Government's witnesses wrote "mimi sounds like a bitch" and

- in another instant message comment during 2008, one of the Government's witnesses wrote "but the only one i can think of, who's a real loose bitch, is my girl."

None of these comments are within the time period of the charged conspiracy or in any way related to the charged conduct at issue in this case.  It is well settled that "the scope and extent of cross-examination lies within the sound discretion of the trial judge."  *United States* v. *Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990).  As the Supreme Court has written:

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination [of a prosecution witness] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.  And as we observed earlier this term, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross examination that is effective in whatever way, and to whatever extent, the defense might wish.

*United States* v. *Van Arsdall*, 475 U.S. 673, 679 (1986) (citation omitted) (emphasis in original).  "'Trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witnesses' safety, or interrogation that is repetitive or only marginally relevant.'" *United States* v. *Crowley*, 318 F.3d 401, 417 (2d Cir. 2003), *cert. denied*, 124 S. Ct. 239 (2003) (quoting *Delaware* v. *Van Arsdall*, 475 U.S. 673, 679 (1986)).  "Further, under Rule 403, the district court may exclude even relevant evidence if it finds that the 'probative value [of the testimony] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.' Fed. R. Evid. 403." *Crowley*, 318 F.3d at 417 (quoting *United States* v. *Flaherty*, 295 F.3d 182, 191 (2d Cir. 2002)).

In addition, Federal Rule of Evidence 611 gives the District Court the power to exercise "reasonable control over the mode and order of interrogating witnesses" so as to "protect witnesses from harassment or undue embarrassment."  Fed. R. Evid. 611.

The defense should be precluded from cross-examination regarding the use of sexist language by Government witnesses or co-conspirators.  The use of such language is simply not relevant to the issues to be determined at trial as it does not bear on the witnesses' or defendant's involvement in a criminal insider trading scheme, nor on the witnesses' credibility at trial.  Indeed, as summarized above, the Second Circuit has repeatedly approved precluding cross-examination about criminal sexual conduct since such conduct does not bear on a witness's character for truthfulness and credibility.  *See, e.g.*, *United States* v. *Rosa*, 11 F.3d 315, 336 (2d Cir. 1993); *United States* v. *Rabinowitz*, 578 F.2d 910, 912 (2d Cir. 1978).  Here, immature locker-room banter, however sexist and disgusting, has even less bearing on a witness's credibility, and thus should be precluded.  *See, e.g.*, *United States* v. *Gonzalez*, 938 F. Supp. 1199 (D. Del. 1996) ("That [a government witness] may be regarded as a racist or a sexist individual by others is precisely the type of character evidence Rule 608(a) is designed to prohibit, as it is not in any way probative of [the witness's] character for truthfulness or untruthfulness.").

## V. The Court Should Preclude Certain Defense Evidence, Questioning, Comments In Opening Statements, And Argument

The defense should not be permitted to make the following arguments, or to attempt to introduce certain evidence, as explained below.

### 1. Penalties Faced By The Defendant

The Court should preclude the defendant from presenting any evidence or argument or otherwise exposing the jury to the potential consequences of convicting the

14

defendant.  The Supreme Court has reiterated the "well established" rule that juries should not be permitted to consider the potential penalties faced by criminal defendants.  *See Shannon* v. *United States*, 512 U.S. 573, 579 (1994); *United States* v. *Blume*, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences.").  This case presents no reason for the Court to depart from this settled rule by allowing the defense to introduce information concerning potential sentences.  Accordingly, the Court should preclude the parties from introducing any information — whether through jury addresses, witness examinations, or otherwise — about any of the potential consequences of conviction.

### 2.   Prosecutorial Motives, Conduct, and Investigative Methods

The defendant should be prohibited from raising, in any way, the Government's motives and conduct in prosecuting him and/or the Government's investigative and prosecutorial methods.  It is well-established that the Government's motives for and conduct during the prosecution of a defendant are irrelevant to guilt or innocence and therefore cannot be presented to the jury.  *See United States* v. *Regan*, 103 F.3d 1072 (2d Cir. 1997); *United States* v. *Rosado*, 728 F.2d 89 (2d Cir. 1984).  It is equally well-established that the Government's techniques in investigating and prosecuting crimes are entirely irrelevant to guilt or innocence and should not be considered by the jury.  *United States* v. *Saldarriaga*, 204 F.3d 50, 52-53 (2d Cir. 2000); *see also United States* v. *Martha Stewart*, 03 CR. 717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting the Government's motion *in limine* and holding "any evidence that raises questions of prosecutorial bias against Stewart has no bearing on the issues properly before the jury, including the credibility of cooperating witnesses"; "The defense may not argue or present evidence to the jury that tends to show that this count is an unusual or unprecedented application of the securities laws. Such evidence improperly invites the jury to make legal

determinations. Those determinations are the exclusive province of the court.").  The defendant remains free to impugn the weight and/or the quality of the proof that the Government actually adduces at trial to the extent that it bears on guilt or innocence, but he may not put the motivations or conduct of prosecutors or law enforcement agents in issue in order to invite the jury to acquit based on alleged governmental misconduct.

Nor can the defendant argue that he was selectively prosecuted or singled out because other individuals have not been prosecuted by our Office.  "The issue to be determined is whether [the defendant] committed the crimes charged; not whether others may have committed uncharged crimes." *United States* v. *White*, No. 02 Cr. 1111 (KTD), 2003 WL 721567, at \*7 (S.D.N.Y. Feb. 28, 2003).  Thus, evidence or argument concerning what other people have or have not been charged with is a "waste of time and thus is totally irrelevant." *Id*.  In any event, because selective prosecution is not a defense on the merits to the criminal charge itself, but one based on "defects in the institution of the prosecution," Fed. R. Crim. P. 12(b)(1), it must be asserted before trial. *United States* v. *Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983); *United States* v. *Taylor*, 562 F.2d 1345, 1356 (2d Cir. 1977).  Such a claim can never be properly presented to the jury, but rather should only be considered by the Court before trial. *Regan*, 103 F.3d at 1082 ("the selective prosecution defense is an issue for the court rather than the jury"); *United States* v. *Danielson*, No. 97 Cr. 295 (RPP), 1998 WL 226200, at \*1 (S.D.N.Y. May 5, 1998) (same); *United States* v. *Jones*, 52 F.3d 924, 927 (11th Cir. 1995) (same); *United States* v. *Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983) (same); *United States* v. *Berrigan*, 482 F.2d 171 (3d Cir. 1973) (same).

In sum, any evidence or argument that the Government's motives in prosecuting the defendant have been improper, that the manner in which the Government obtained evidence was

improper, and/or that the defendant has been selectively prosecuted and that others have not been similarly prosecuted, is inappropriate and should be precluded by the Court.

3.      Jury Nullification

In *United States* v. *Thomas*, 116 F.3d 606, 616 (2d Cir. 1997), the Second Circuit held that "trial courts have a duty to forestall or prevent [jury nullification], whether by firm instruction or admonition, or where it does not interfere with guaranteed rights or the need to protect the secrecy of jury deliberations, . . . by dismissal of the offending juror from the venire or jury."

As a matter of precaution, the Government asks the Court to inquire as to whether the defense intends to raise any arguments with the aim of convincing the jury that his conduct should be excused, even if criminal, for any reason.  For example, Durant should be precluded from presenting any evidence or argument or otherwise exposing the jury through opening statements, during cross-examination, or otherwise to the purported damage that Durant has suffered to his reputation and other interests since his arrest.

None of these subjects, considered singly or together, is relevant to guilt or innocence.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Government's motions *in limine* should be granted.

Dated:  November 18, 2014
           New York, New York

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney

                          By:  ____//s//_____
                                        Jessica Masella
                                        Andrew Bauer
                                        Damian Williams
                                        Assistant United States Attorneys
                                        Tel. No.: (212) 637-2288/2354/2298