UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x
                                     :

UNITED STATES OF AMERICA
                                     :

    - v. -
                                     :

BENJAMIN DURANT,
                                     :

           Defendant.
                                     :

- - - - - - - - - - - - - - - x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:        1 9 2014
```

INDICTMENT

S4 12 Cr. 887 (ALC)

## COUNT ONE

(Conspiracy to Commit Securities Fraud)

     The Grand Jury charges:

### The Defendant and Other Relevant Parties

     1.   At all times relevant to this Indictment, BENJAMIN DURANT, the defendant, was a stock broker in the Manhattan office of a Connecticut-based securities trading firm ("Securities Trading Firm-1").

     2.   At all times relevant to this Indictment, Daryl Payton worked as a stock broker at Securities Trading Firm-1.

     3.   At all times relevant to this Indictment, David J. Weishaus worked as a stock broker at Securities Trading Firm-1.

     4.   At all times relevant to this Indictment, Thomas C. Conradt worked as a stock broker at Securities Trading Firm-1.

     5.   At all times relevant to this Indictment, CC-1, a co-conspirator not charged as a defendant herein, worked as a stock broker in the Manhattan office of Securities Trading Firm-1.

BENJAMIN DURANT, the defendant, was part of a circle of friends with David J. Weishaus, Thomas C. Conradt, Daryl Payton, CC-1 and others.

6.    At all times relevant to this Indictment, Trent Martin shared an apartment in Manhattan with Thomas C. Conradt. Martin was a citizen of Australia.  Martin worked primarily in Stamford, Connecticut for an international financial services firm as a research analyst.

7.    At all times relevant to this Indictment, International Business Machines ("IBM") was a publicly-traded global technology and services company based in Armonk, New York.

8.    Before it was acquired by IBM on or about October 2, 2009, as described in more detail below, SPSS Inc. ("SPSS") was a publicly-traded software company based in Chicago, Illinois. SPSS's common stock traded on the Nasdaq stock exchange.

9.    At all times relevant to this Indictment, the "New York Law Firm" was a large Manhattan-based law firm that had a significant mergers and acquisitions practice.

10.    At all times relevant to this Indictment, Attorney-1 was a citizen of New Zealand who lived in Manhattan and worked as a corporate lawyer for the New York Law Firm in Manhattan.

### Overview of the Insider Trading Scheme

11.    As set forth in more detail below, BENJAMIN DURANT, the defendant, and his co-conspirators, traded in the securities of SPSS after having obtained material, nonpublic information (the "Inside

2

Information") related to the acquisition of SPSS by IBM (the "IBM/SPSS Transaction"). DURANT obtained Inside Information regarding the IBM/SPSS Transaction from Thomas C. Conradt, his co-worker at Securities Trading Firm-1, including such details as the names of the parties involved in the Transaction, the general nature of the Transaction, and the share price at which IBM proposed to buy SPSS before the IBM/SPSS Transaction was publicly announced in late July 2009. Conradt had obtained the Inside Information from Trent Martin, Conradt's roommate and friend. Martin's source of information was Attorney-1, with whom Martin had a history, pattern and practice of sharing personal and professional confidences.

12. Specifically, beginning in or about May 2009, Attorney-1, as part of the New York Law Firm's representation of IBM, began working on the IBM/SPSS Transaction and acquired the Inside Information. Between May and July 2009, Attorney-1 improperly disclosed to Martin the Inside Information, consistent with their pattern and practice of sharing confidences. In violation of the duty of trust and confidence that Martin owed to Attorney-1, Martin traded on the Inside Information and tipped the Inside Information to his roommate, Conradt. Conradt, in turn, shared the Inside Information concerning the IBM/SPSS Transaction with BENJAMIN DURANT, the defendant, David J. Weishaus, Daryl Payton, and CC-1. In particular, Conradt told DURANT, Weishaus, Payton, and CC-1 that he had obtained the Inside Information from his roommate, Martin, who had instructed

Conradt not to further disseminate the Inside Information.

13.   BENJAMIN DURANT, the defendant, and co-conspirators Conradt, Weishaus, Payton, and CC-1, executed and caused to be executed securities transactions in SPSS stock before the public announcement of the IBM/SPSS Transaction based in whole or in part on the Inside Information provided to them, with knowledge that the Inside Information was obtained in violation of a duty of trust and confidence.   DURANT made substantial profits from these trades, as the stock price of SPSS rose considerably upon the public announcement of the IBM/SPSS Transaction on July 28, 2009.

### Duty of Trust and Confidence Owed by Martin to Attorney-1

14.   At all times relevant to this Indictment, Martin and Attorney-1 were close friends who had a history, pattern and practice of sharing confidences with each other relating to their careers, families, relationships, and plans for the future.   Martin and Attorney-1 sought advice from each other and shared common interests, a common cultural background, and the common experience of being single men who worked in demanding industries and lived far from their home countries of, respectively, Australia and New Zealand.

15.   At various times, Attorney-1 and Martin exchanged personal confidences as well as non-public information concerning their jobs.   For example, on one occasion in or about December 2008, Martin allowed Attorney-1 to read an email that Martin had sent to colleagues at his firm in which he provided advice about the stock

4

market.   On another occasion, in or about June 2009, Martin sought
Attorney-1's advice after he was arrested in connection with an
altercation in Grand Central Terminal in New York, New York.

### Attorney-1 Learns Inside Information
### About the IBM/SPSS Transaction and Shares it with Martin

16.   In or about the spring of 2009, the New York Law Firm
represented IBM in connection with an offer by IBM to acquire SPSS.
The New York Law Firm assigned various partners and associates to work
on the matter.  Given the confidential nature of the IBM/SPSS
Transaction, and the risk of insider trading if the details of the
transaction leaked before it was publicly announced, the New York Law
Firm took various precautions to maintain its secrecy.  Among other
things, the New York Law Firm used code names for IBM and SPSS in the
documents that it prepared in connection with the IBM/SPSS
Transaction.  At all relevant times, the New York Law Firm maintained
a strict written policy prohibiting any person connected with the firm
from, among other things, "[r]evealing 'inside' information to anyone
else except on a strict 'need to know' basis."  On or about September
29, 2008, Attorney-1 certified to the New York Law Firm in writing that
he had read and understood this policy.

17.   On or about May 26, 2009, the New York Law Firm assigned
Attorney-1 to work on the IBM/SPSS Transaction.  Thereafter,
Attorney-1 learned material non-public information concerning the
proposed transaction, including the names of the parties involved, the

general nature of the transaction, and the share price at which IBM proposed to buy SPSS ($50 per share).

18.   In or about late May 2009, following Attorney-1's assignment to the IBM/SPSS Transaction, Attorney-1 met his close friend, Martin, for lunch at a restaurant in Manhattan.  During the meeting, Attorney-1 confided in Martin that he was feeling significant stress as a result of being assigned to the IBM/SPSS Transaction.

19.   In the course of describing his personal and professional concerns to Martin, Attorney-1 told Martin that IBM was negotiating to acquire SPSS for a significant premium over its market price.  Martin knew that Attorney-1 expected Martin to maintain the confidentiality of this Inside Information about the IBM/SPSS Transaction because of, among other reasons, their history, pattern and practice of sharing confidences.

20.   As of the date of this lunch (on or about May 31, 2009), the fact that IBM had offered to buy SPSS, and the fact that IBM had offered to buy SPSS for a significant premium, were not publicly known.

### DURANT, Conradt, Weishaus, Payton and CC-1 Use the Inside Information to Trade in SPSS

21.   On or about June 3, 2009, Martin bought approximately 1,500 shares of SPSS common stock for approximately $34.20 per share in his personal brokerage account on the basis of Inside Information concerning the IBM/SPSS Transaction.  On or about July 22, 2009, Martin also purchased approximately 29 SPSS call option contracts at

a strike price of $35, with an expiration date of September 19, 2009.
Each of these call option contracts represented the right, but not the
obligation, to purchase 100 shares of SPSS common stock at the strike
price before the expiration of the contracts.

22.   In or about mid-July 2009, Martin met with Attorney-1.
In the course of that conversation, Martin learned that the IBM/SPSS
transaction would be closing that week at approximately $50 per share.

23.   Shortly thereafter, Martin confirmed to Thomas C.
Conradt that an IBM purchase of SPSS was going forward and would happen
soon.   Conradt later passed this information to David J. Weishaus,
Daryl Payton, CC-1, and to BENJAMIN DURANT, the defendant.   These
facts concerning IBM and SPSS were not publicly known when this
information was passed from Martin to Conradt, and from Conradt to
DURANT.

24.   On or about July 20, 2009, and continuing through on
or about July 22, 2009, BENJAMIN DURANT, the defendant, purchased
approximately 60 SPSS call option contracts with a $40 strike price
for $0.60 per contract and an expiration date of September 19, 2009,
on the basis of Inside Information concerning the IBM/SPSS
Transaction.   Each of these call option contracts represented the
right, but not the obligation, to purchase 100 shares of SPSS common
stock at the strike price before the expiration of the contracts.

25.   On or about July 22, 2009, Martin purchased
approximately 29 SPSS call option contracts at a strike price of $35

7

and an expiration date of September 19, 2009, on the basis of Inside Information concerning the IBM/SPSS Transaction.

26.   On or about July 23, 2009 and July 27, 2009, Conradt purchased approximately 140 shares of SPSS common stock, at prices between $34.90 and $34.98 per share, on the basis of Inside Information concerning the IBM/SPSS Transaction.

27.   On or about July 22, 2009, Weishaus purchased approximately 100 SPSS call option contracts at a strike price of $40 and an expiration date of September 19, 2009, on the basis of Inside Information concerning the IBM/SPSS Transaction.

28.   On or about July 22, 2009, CC-1 purchased approximately 30 SPSS call option contracts at a strike price of $40 and an expiration date of August 22, 2009, and 20 SPSS call option contracts at a strike price of $40 and an expiration date of September 19, 2009, on the basis of Inside Information concerning the IBM/SPSS Transaction.

29.   On or about July 22, 2009, and continuing through on or about July 27, 2009, Daryl Payton purchased approximately 270 SPSS call option contracts at a strike price of $40 and expiration dates of either August 15, 2009, or September 19, 2009, on the basis of Inside Information concerning the IBM/SPSS Transaction.

## Martin Admits to Attorney-1 That He Had
## Traded on the Inside Information

30.   On or about July 23, 2009, Martin visited Attorney-1 at his (Attorney-1's) apartment in Manhattan.   At that time, Martin told Attorney-1 that he (Martin) had purchased SPSS common stock and call options on the basis of the Inside Information that Attorney-1 had disclosed to Martin at their lunch on or about May 31, 2009. Martin expressed concern to Attorney-1 that, since he had bought a significant volume of SPSS call options at a favorable price, the transactions would attract attention.   Martin sought Attorney-1's advice on the situation and told Attorney-1 that Martin would suffer a loss if he unwound his long position in SPSS at that time. Attorney-1 was upset with Martin and urged Martin to sell his SPSS shares and options immediately.   Martin and Attorney-1 discussed various ways in which Martin could cancel or unwind his SPSS options position without attracting attention.   Martin apologized to Attorney-1 for trading on the information Attorney-1 had told him at the lunch meeting.

31.   On or about July 24, 2009, Martin sold the approximately 29 SPSS call option contracts that he had purchased on or about July 22, 2009.   Thereafter, on or about July 27, 2009, Martin sold approximately 1,000 of the approximately 1,500 SPSS shares that he had purchased on or about June 3, 2009.

## The Public Announcement of the IBM/SPSS Transaction

32.  On or about July 28, 2009, at approximately 7:31 a.m., IBM and SPSS publicly announced the IBM/SPSS Transaction.  That same day, SPSS's share price closed at approximately $49.45, up approximately 41 percent from the prior day's closing price of approximately $35.09 per share.

33.  Several hours after announcement of the IBM/SPSS Transaction on July 28, 2009, Conradt, CC-1, and BENJAMIN DURANT, the defendant, went to lunch together at a restaurant near their office.  During the lunch, CC-1 discussed, among other things, the fact that he had sought legal advice in connection with his trading in SPSS in the weeks prior to the announcement.  At the conclusion of lunch, DURANT offered to pay for everyone's lunch, but stated, in sum and substance, that he would only do so in cash, so as to not generate a record of their lunch meeting.

34.  On or about the evening of July 28, 2009, Conradt, Weishaus, Payton, CC-1, and BENJAMIN DURANT, the defendant, and others met at a hotel in Manhattan, New York.  At that meeting, DURANT and the others discussed their trading in SPSS securities, as well as how much money they had made.  Later that evening, DURANT suggested that if anyone asked why they had traded in SPSS securities, they should simply say that they liked technology stocks.

**DURANT, Martin, Conradt, Weishaus, Payton and CC-1**
**Profit From Trading in SPSS**

35.   On or about July 20, 2009, up through and including on or about July 22, 2009, BENJAMIN DURANT, the defendant, purchased various SPSS call options on the basis of Inside Information concerning the IBM/SPSS Transaction.  After the IBM/SPSS Transaction was publicly announced, DURANT sold these call options for a profit of at least approximately $53,242.

36.   On or about July 28, 2009, when IBM and SPSS publicly announced their transaction, Thomas C. Conradt held approximately 140 shares of SPSS common stock that he had purchased on the basis of Inside Information concerning the IBM/SPSS Transaction.  Conradt sold those shares on or about July 29, 2009, yielding a profit of at least approximately $2,538.

37.   On or about July 28, 2009, David J. Weishaus held various SPSS call options that he had purchased on the basis of Inside Information concerning the IBM/SPSS Transaction.  After the IBM/SPSS transaction was publicly announced, Weishaus sold these options, yielding a profit of at least approximately $91,767.

38.   On or about July 28, 2009, Martin held approximately 500 shares of SPSS common stock that he had purchased on the basis of Inside Information concerning the IBM/SPSS Transaction.  Martin held these shares through the completion of the IBM/SPSS Transaction, and then, on or about October 5, 2009, Martin sold these shares,

11

yielding a profit of at least approximately $7,900.

39.   On or about July 28, 2009, CC-1 held various SPSS call options that he had purchased on the basis of Inside Information concerning the IBM/SPSS Transaction.   CC-1 sold these options on July 28, 2009, yielding a profit of at least approximately $44,250.

40.   On or about July 28, 2009, Daryl Payton held various SPSS call options that he had purchased on the basis of Inside Information concerning the IBM/SPSS Transaction.   After the IBM/SPSS transaction was publicly announced, Payton sold these call options for a profit of at least approximately $254,360.

41.   Prior to the sale of his call options, Daryl Payton first transferred his options from securities accounts at Securities Trading Firm-1 to two securities accounts that he opened at Interactive Brokers during the period from approximately July 30, 2009 through August 4, 2009.   In connection with opening those accounts, Payton falsely informed Interactive Brokers during a recorded telephone call that he was a "self-employed real estate consultant," rather than a stock broker at Securities Trading Firm-1. In that call, a representative from Interactive Brokers specifically informed Payton that if he worked at a broker/dealer, duplicate account statements might have to be sent to his employer. Nevertheless, Payton did not inform Interactive Brokers that he worked at Securities Trading Firm-1.

## The Securities Trading Firm-1 Investigation

42.   In or about November 2009, Securities Trading Firm-1 conducted an internal investigation into the trading of SPSS securities by David J. Weishaus, Daryl Payton, CC-1, and BENJAMIN DURANT, the defendant.  By that time, Thomas C. Conradt was no longer employed at Securities Trading Firm-1.  At the request of Securities Trading Firm-1, each of those individuals completed questionnaires inquiring into the reasons the individual invested in SPSS securities in the summer of 2009.

43.   In his questionnaire, BENJAMIN DURANT, the defendant, indicated that he had first heard of SPSS while researching investment opportunities on Fidelity.com in June 2009. He stated that he had received details on SPSS's business and its finances before investing from "various analysts," principally through Fidelity.com and Standard and Poor's.  He indicated, in sum and substance, that his purchases of SPSS were based on research into the company and that he had a long history of using options for leverage.  At no point did he indicate to Securities Trading Firm-1 that he had heard about SPSS from, or spoken about the company with, Conradt, Weishaus, Payton, or CC-1.

44.   After reviewing the answers provided in the questionnaires by Weishaus, Payton, CC-1, and BENJAMIN DURANT, the defendant, Securities Trading Firm-1 asked each of those individuals to fill out an additional questionnaire relating to their trading

13

in SPSS securities.  Each of the individuals, including DURANT, refused.  Securities Trading Firm-1 then terminated each of the individuals.

45.   In or about October 2010, Attorney-1 informed Martin that the New York Law Firm was investigating insider trading in relation to the IBM/SPSS Transaction.

46.   In or about November 2010, Martin told Attorney-1 that he had disclosed Attorney-1's Inside Information to Martin's roommate, Thomas C. Conradt, before the transaction was publicly announced.  Martin apologized to Attorney-1 for disclosing the information concerning the IBM/SPSS Transaction to Conradt.

47.   Later in or about November 2010, Attorney-1 visited Martin at Martin's apartment in Manhattan.  At that time, Martin was packing up his belongings to leave New York City.  Martin told Attorney-1 that Martin had quit his job and was returning to Australia in light of the investigation of insider trading.

## STATUTORY ALLEGATIONS

### The Conspiracy

48.   From in or about June 2009, through and including in or about September 2009, in the Southern District of New York and elsewhere, BENJAMIN DURANT, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit an offense against the United States, to wit, securities fraud, in violation of Title

15, United States Code, Sections 78j.(b) & 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2(b)(1)&(2).

## Object of the Conspiracy

49.   It was a part and object of the conspiracy that BENJAMIN DURANT, the defendant, and others known and unknown, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, willfully and knowingly would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2(b)(1)&(2).

## Means And Methods Of The Conspiracy

50.   Among the means and methods by which BENJAMIN DURANT, the defendant, and others known and unknown, would and did carry out

the conspiracy were the following:

      a.    Attorney-1, without the permission of the New York Law Firm, disclosed to Martin Inside Information about the IBM/SPSS Transaction.

      b.    Martin misappropriated Inside Information from Attorney-1 concerning the IBM/SPSS Transaction in violation of the duty of trust and confidence that Martin owed to Attorney-1, with whom Martin had a history, pattern and practice of sharing personal and professional confidences, such that Martin knew that he should not trade on the Inside Information or share it with others.

      c.    Martin shared Inside Information concerning the IBM/SPSS Transaction with his friend and roommate, Thomas C. Conradt.

      d.    Conradt, in turn, shared Inside Information concerning the IBM/SPSS Transaction with his co-conspirators DURANT, David J. Weishaus, Daryl Payton, and CC-1.  In particular, Conradt told DURANT, Weishaus, Payton, and CC-1 that he had obtained the Inside Information from his roommate, Martin, who had instructed Conradt not to further disseminate the Inside Information.

      e.    While aware of the Inside Information, and while aware that the Inside Information was obtained in violation of a duty of trust and confidence, DURANT, Conradt, Weishaus, Payton, and CC-1 bought SPSS call options and/or common stock before the public announcement of the IBM/SPSS Transaction.

      f.    After the IBM/SPSS Transaction was publicly

announced on July 28, 2009, DURANT, Conradt, Weishaus, Payton, and CC-1 exercised their call options and/or sold their common stock, realizing profits based on the considerable rise of SPSS's stock price upon the public announcement of the transaction.

### Overt Act

51.  In furtherance of the conspiracy and to effect the illegal object thereof, BENJAMIN DURANT, the defendant, and others known and unknown, committed the following overt act, among others, in the Southern District of New York and elsewhere:

a.  On or about July 22, 2009, DURANT, while working at the offices of Securities Trading Firm-1 in Manhattan, purchased approximately 50 SPSS call option contracts on the basis of Inside Information concerning the IBM/SPSS Transaction.

(Title 18, United States Code, Section 371.)

### COUNTS TWO AND THREE

(Securities Fraud)

The Grand Jury further charges:

52.  The allegations contained in paragraphs 1 through 50 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

53.  On or about the trade dates set forth below, in the Southern District of New York and elsewhere, BENJAMIN DURANT, the defendant, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of

the facilities of national securities exchanges, in connection with the purchase and sale of securities, willfully and knowingly did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, DURANT executed the securities transactions listed below on the basis of Inside Information concerning the IBM/SPSS Transaction:

| COUNT | TRADE DATE | TRANSACTION |
|-------|-----------|-------------|
| TWO | 7/20/09 | Purchased 10 SPSS call option contracts with a $40 strike price for $0.55 per contract, expiring on 9/19/09 |
| THREE | 7/22/09 | Purchased 50 SPSS call option contracts with a $40 strike price for $0.60 per contract, expiring on 9/19/09 |

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2(b)(1)&(2); and Title 18, United States Code, Section 2.)

### FORFEITURE ALLEGATION

54.  As a result of committing one or more of the foregoing securities fraud offenses alleged in Counts One through Three of this Indictment, BENJAMIN DURANT, the defendant, shall forfeit to the

United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities fraud offenses alleged in Counts One through Three of this Indictment, including but not limited to the following:

<u>Money Judgment</u>

a.    At least a sum of money in United States currency that constitutes or was derived from proceeds traceable to the commission of the securities fraud offenses alleged in Counts One through Three of this Indictment.

**<u>Substitute Assets Provision</u>**

55.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

> (i)     cannot be located upon the exercise of due diligence;
>
> (ii)    has been transferred or sold to, or deposited with, a third party;
>
> (iii)   has been placed beyond the jurisdiction of the court;
>
> (iv)    has been substantially diminished in value; or

(v)     has been commingled with other property which

cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United

States Code, Section 853(p), to seek forfeiture of any other property

of said defendant up to the value of the forfeitable property

described above.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 18, United States Code, Sections 371 & 981;
Title 21, United States Code, Section 853(p);
Title 28, United States Code, Section 2461;
and Title 17, Code of Federal Regulations,
Sections 240.10b-5 and 240.10b5-2(b)(1)&(2).)


_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

20

Form No. USA-33s-274 (Ed. 9-25-58)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**- v. -**

**BENJAMIN DURANT,**

**Defendant.**

**INDICTMENT**

S4 12 Cr. 887 (ALC)

(18 U.S.C. §§ 371, 2;
15 U.S.C. §§ 78j(b) & 78ff;
17 C.F.R.§§ 240.10b-5 & 240.10b5-
2(b)(1)&(2).)

_____                    PREET BHARARA
Foreperson.                    United States Attorney.

_____

11/19/14   TRUE BILL & INDICTMENT

MAG JUDGE RONALD L ELLIS